# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| CONNECTICUT RETIREMENT PLANS AND TRUST FUNDS; NORTH CAROLINA DEPARTMENT OF STATE TREASURER; PUBLIC EMPLOYEES' RETIREMENT ASSOCIATION OF COLORADO, and CITY OF PHILADELPHIA BOARD OF PENSIONS AND RETIREMENT, | ( ( ( ( ( ( ( ( | CIVIL ACTION NO. |
| Plaintiffs, | ( ( ( | |
| vs. | ( ( | **JURY TRIAL DEMANDED** |
| BP, PLC; BP AMERICA, INC.; BP EXPLORATION & PRODUCTION, INC.; ANTHONY B. HAYWARD; DOUGLAS SUTTLES, H. LAMAR MCKAY; BRYON E. GROTE; DAVID RAINEY; ROBERT DUDLEY; and ROBERT MALONE, | ( ( ( ( ( ( ( ( ( | |
| Defendants. | ( ( | |

# COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS AND TEXAS STATUTORY AND COMMON LAW

i

# TABLE OF CONTENTS

| I. | NATURE OF THE ACTION AND OVERVIEW | 2 |
|---|---|---|
| II. | JURISDICTION AND VENUE | 6 |
| III. | PARTIES | 7 |
| | A. Plaintiffs | 7 |
| | B. Defendants | 9 |
| IV. | SUBSTANTIVE ALLEGATIONS | 12 |
| | A. Prior Disasters Result In The Baker Report | 12 |
| | B. The Baker Report | 16 |
| | C. BP Retaliates Against Workers | 21 |
| | D. BP Experienced Well Blowouts During The Relevant Period As The Result Of Faulty Cementing | 22 |
| | E. The Deepwater Horizon Disaster Establishes That "Process" Safety Improvements Were Not Being Implemented | 24 |
| | F. BP Has No Legitimate Spill Response Plan | 31 |
| V. | DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE RELEVANT PERIOD | 39 |
| VI. | SCIENTER ALLEGATIONS | 54 |
| | A. Hayward Falsely Assured Investors That BP Was Implementing The Baker Report's Recommendations | 54 |
| | B. Defendants' Estimates Of Oil Spilling Into The Gulf Are Contradicted By Cotemporaneous Internal BP Documents | 56 |
| VII. | LOSS CAUSATION/ECONOMIC LOSS | 60 |
| VIII. | APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE | 65 |
| IX. | NO SAFE HARBOR | 66 |
| X. | COUNTS | 67 |

FIRST CLAIM: Violation of Section 10(b) of The Exchange Act and Rule 10b-5 Promulgated Thereunder ..... 67

SECOND CLAIM: Violation of Section 20(a) of The Exchange Act ..... 69

THIRD CLAIM: Common Law Fraud and Deceit ..... 70

FOURTH CLAIM: Statutory Fraud – Tex. Bus. & Comm. Code § 27.01 ..... 72

FIFTH CLAIM: Negligent Misrepresentation ..... 74

Plaintiffs, Connecticut Retirement Plans and Trust Funds ("Connecticut Retirement Funds"), North Carolina Department of State Treasurer ("North Carolina DST"), Public Employees' Retirement Association of Colorado ("Colorado PERA"), and City of Philadelphia Board of Pensions and Retirement ("City of Philadelphia") (collectively, "Plaintiffs"), allege the following based upon the investigation of Plaintiffs' counsel, which includes, among other things, a review of Defendants'[1] public documents, conference calls and announcements, United States Securities and Exchange Commission ("SEC") filings, Defendants' filings and statements to government regulators including, inter alia, the U.S. Minerals Management Service ("MMS"), wire and press releases published by and regarding BP p.l.c. ("BP" or the "Company"), pleadings and filings in In re BP p.l.c. Securities Litigation, No. 10-md-02185 (S.D. Tex.), the Court's Order denying in part Defendants' motion to dismiss claims in In re BP p.l.c. Securities Litigation, No. 10-md-2185, 2012 WL 432611 (S.D. Tex. Feb. 13, 2012) ("BP I"), investigations and reports issued in connection with the April 20, 2010 explosion aboard the Deepwater Horizon and the subsequent oil spill in the Gulf of Mexico ("Gulf") (See e.g., National Commission on the BP Deepwater Horizon Oil Spill and Offshore Drilling, Report to the President, "The Gulf Oil Disaster and the Future of Offshore Drilling," Jan. 2011 (the "Presidential Commission"); The Bureau of Ocean Energy Management, Regulation and Enforcement, "Report Regarding The Causes Of The April 20, 2010 Macondo Well Blowout," Sept. 14, 2011 (the "Interior Department Report")) and securities analysts' reports and advisories about the Company. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

[1] As defined below. Unless otherwise noted, all emphasis herein are added.

2

# I.   NATURE OF THE ACTION AND OVERVIEW

1.      Plaintiffs bring this action for damages sustained in connection with their transactions in BP American Depositary Shares ("ADS")[2] and ordinary shares between January 16, 2007 and May 28, 2010, inclusive (the "Relevant Period").  As detailed herein, Plaintiffs suffered significant losses when events following the April 20, 2010 explosion aboard the Deepwater Horizon semi-submersible rig and the subsequent historic oil spill from the Macondo Prospect ("Macondo"), revealed that Defendants' prior statements regarding, *inter alia*, BP's purported implementation of specific process safety protocols recommended by an independent panel due to numerous accidents and BP's ability to respond to oil spills in the Gulf, were materially false and misleading when made.

2.      The April 20, 2010 disaster led to the tragic loss of eleven lives and BP's inability to cap millions of barrels of oil leaking into the Gulf for nearly three months resulted in the largest recorded offshore oil spill in history.  While it is difficult to compare the loss of life and the devastating impact on the environment to a purely economic injury, the resulting financial injury suffered by BP investors was still enormous and is compensable under applicable laws.

3.      BP is one of the world's largest energy companies, providing its customers with fuel for transportation, energy for heat and light, retail services and petrochemicals products. Among other things, the Company engages in deepwater drilling for hydrocarbons around the globe.

4.      BP's dominance in the global energy market aside, the Company had a history of catastrophic disasters resulting in deaths and environmental crimes leading into the Relevant Period.   These incidents, which included the Prudhoe Bay, Alaska and Texas City, Texas disasters, among others described herein, led the Company to retain former Secretary of State

[2]   As used herein, ADS also includes any BP securities designated as "American Depositary Receipts."

James A. Baker to lead an independent panel (the "Baker Panel") to review and improve the Company's safety procedures and to identify root causes of the Texas City disaster. The Baker Panel's investigation resulted in a 350 plus page report – the "Baker Report"— which cited organizational problems as the root cause of BP being plagued by major incidents and repeated safety lapses.

5.     As noted by the Presidential Commission, the Baker Report concluded, among other things, that "BP management had not distinguished between occupational safety ... and *process safety*," and "ha[d] not adequately established process safety as a core value." Whereas process safety seeks to implement protocols in order to avoid large scale disasters (such as a deadly explosion), occupational safety seeks to limit injuries to persons (reducing slips and falls).

6.     The Baker Report also included specific recommendations for BP to implement to improve process safety. The Baker Report was publicly released by Defendants on January 16, 2007,[3] and was accompanied by statements from BP executives assuring investors that the recommendations set forth in the Baker Report would be (and were already being) implemented by the Company.

7.     Following the release of the Baker Report, the Company's public statements routinely detailed specific steps taken by BP to purportedly reform its risk profile while reducing the possibility that lapses leading to the pre-Relevant Period disasters would be repeated. For example, in connection with the release of the Baker Report, BP's then Chief Executive Officer ("CEO"), stated that "*BP gets it, and I get it too*,' . . . 'I recognize the need for improvement.'" Defendant Anthony B. Hayward ("Hayward"), who was at the time in the process of taking over for Browne as BP's CEO, assured investors (in February 2007) about his

[3] The Baker Report is available at http://www.bp.com/liveassets/bp_internet/globalbp/globalbp_uk_english/SP/STAGING/local_assets/assets/pdfs/Bak er_Panel_report.pdf, last accessed Apr. 17, 2012.

4

commitment to *focus "like a laser" on safety*.  Subsequent assurances by BP reaffirmed the Company's commitment to implement the recommendations in the Baker Report.

8.    Against the backdrop of process safety reforms purportedly being guided by the recommendations in the Baker Report, BP was increasing its presence in the Gulf and holding out its potential to extract hydrocarbons from the Gulf as highly material to its operations and future prospects.  The Company's regulatory filings also assured investors that BP was fully prepared to address the risks associated with its Gulf operations.  For example, the Company's oil spill response plan ("OSRP") for the Gulf proclaims that the "worst case discharge" from an exploratory well from offshore drilling is expected to be *250,000 barrels* of crude oil per day. *See* BP Regional Oil Spill Response Plan – Gulf of Mexico, Appx. H at p. 30 ("Regional OSRP").  The Company's Initial Exploration Plan for Mississippi Canyon Block 252 (marked received by the MMS on Feb. 23, 2009) ("Macondo IEP") also assured investors that "worst case" scenarios were contemplated by BP and that the Company was capable of responding to a worst case event.  Defendants' misstatements assured investors that BP could experience significant growth while controlling risks.

9.    On the night of April 20, 2010, the risks concealed by Defendants' false assurances about its progress in implementing the recommendations of the Baker Report and BP's ability to respond to a major oil spill, were exposed as being materially false and misleading when made, when an eruption of oil or natural gas occurred at the Company's Macondo site about 50 miles off the Louisiana coast leading to an intense fire aboard the Deepwater Horizon.

10.    The fire eventually consumed the rig, caused the tragic loss of eleven lives and ultimately caused the rig to sink.  As the Deepwater Horizon sank, it pulled a pipe connecting the

rig to the well (the "riser") with it. The riser subsequently tore away from the well. Crewmembers' efforts to trigger Deepwater Horizon's blow out preventer ("BOP"), a device used to seal a well in an emergency, failed.

11.     The failure of the BOP resulted in oil spilling into the Gulf. Rather than respond to the disaster with a definitive plan to contain the spill, as Defendants had publicly represented BP had put in place, Defendants employed a trial and error approach with various tactics that were developed as the spill was raging. Defendants' efforts included very high profile failures including "top hat," "top kill," and "junk shot." BP's inability to contain the spill within a reasonable period of time established that Defendants' statements regarding BP's spill response plan were materially false and misleading. BP was operating in the Gulf throughout the Relevant Period without any such definitive plan.

12.     By late June 2010, oil had contaminated the coastlines of Louisiana, Alabama, Mississippi, and Florida, and the well had yet to be capped. By this time, approximately 36% of the Gulf's fishing area was closed because of the spill. The amount of oil spewing into the Gulf (approximately 60,000 barrels per day) established that – despite the representations made in BP's MMS filings – the Company had no ability to handle a fraction of the "worst case" estimates provided in its regulatory filings.

13.     Separate from BP's inability to contain the oil spill, BP's officers including, Defendants Hayward, BP's then CEO, and Douglas Suttles ("Suttles"), the head of BP's spill response team, minimized the impact of the disaster by providing the market with materially false and misleading spill figures that were expressly contradicted by contemporaneous internal BP reports that showed higher amounts of oil were spewing into the Gulf than BP's officers had claimed.

14.     All told, it BP took nearly three full months after the explosion on April 20, 2010 to suspend the flow of oil and to ultimately seal the leak with a relief well. The well was finally capped on July 16, 2010, eighty-seven days after oil began spewing into the Gulf from the Macondo site. A relief well permanently sealed the well several days later.

15.     The Gulf spill has eclipsed the Exxon Valdez oil spill in Prince William Sound, Alaska, on March 24, 1989, to become the worst environmental disaster in the history of the United States.

16.     Throughout the Relevant Period, Defendants violated federal and Texas state law by issuing materially false and misleading statements while possessing the required state of mind for each particular claim. In this respect, Defendants either knew or recklessly disregarded that they were making false and misleading statements, or were negligent in making the challenged statements.

17.     The Company's investors have suffered massive losses from the materialization of the risks concealed by Defendants' misstatements and omissions. At the time of the explosion aboard the Deepwater Horizon, BP ADSs traded for approximately $60.00 per ADS and its ordinary shares traded for 655.4 pence per share. After the explosion and BP's inability to adequately respond to the oil spilling into the Gulf, the Company's ADSs and ordinary shares fell significantly, eliminating approximately $91 billion in the Company's total market capitalization value (through June 2010). Plaintiffs' losses are a direct result of Defendants' misconduct as set forth herein.

## II.     JURISDICTION AND VENUE

18.     The claims asserted herein arise under and pursuant to §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule

7

10b-5 promulgated thereunder, 17 C.F.R. 240.10b-5, and under the common and statutory law of the State of Texas.

19.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa; and 28 U.S.C. §§ 1331, 1332. In addition, pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Plaintiffs' state-law claims.

20.     Venue is proper in this District pursuant to pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b). Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District. Additionally, BP's U.S. operations are headquartered in this District and two Defendants maintain their principal places of business in Houston. *See BP I*, 2012 WL 432611, at *2 (citing Lead Plaintiff's Consolidated Class Action Complaint).

21.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including without limitation, the mails, interstate telephone communications, and the facilities of the national securities markets and exchanges.

III.   PARTIES

A.     Plaintiffs

22.     The Connecticut Retirement Fund includes six pension funds and eight trust funds, representing, among others, approximately 190,000 teachers, police officers, firefighters and state and municipal employees who are pension plan participants and beneficiaries, and has assets valued in excess of $25 billion. Led in litigation by the Attorney General of Connecticut and administered by the Office of the Treasurer of the State of Connecticut, the Connecticut

Retirement Fund purchased BP ADS and ordinary shares during the Relevant Period and suffered losses as a result of the violations set forth herein.

23.    North Carolina DST is an arm of the Government of the State of North Carolina, with its offices located in Wake County, North Carolina.  North Carolina DST is entrusted by statute with the responsibility of managing certain state funds, including but not limited to the funds of the Teachers' and State Employees' Retirement System and the Local Governmental Employees' Retirement System.  At the end of the fiscal year closing June 30, 2011, North Carolina DST managed assets of approximately $88.35 billion.  North Carolina DST purchased BP ADS and ordinary shares during the Relevant Period and suffered losses as a result of the violations set forth herein.

24.    Colorado PERA, which was established in 1931, operates by authority of the Colorado General Assembly.  Colorado PERA provides retirement and other benefits to the employees of more than 400 government agencies and public entities in the State of Colorado.  Colorado PERA's membership includes employees of the Colorado state government, most teachers in the State of Colorado, many university and college employees, judges, many employees of Colorado cities and towns, Colorado State Troopers, and the employees of a number of other public entities within the State of Colorado.  With approximately $38 billion in assets and more than 230 employees, Colorado PERA is the 21st largest public pension plan in the United States.  Colorado PERA purchased BP ordinary shares during the Relevant Period and suffered losses as a result of the violations set forth herein.

25.    City of Philadelphia, a local government board created by the Philadelphia Home Rule Charter, 351 Pa. Code § 3.3-100(e), administers the retirement system for the City of

Philadelphia, Pennsylvania. City of Philadelphia purchased BP ADS and ordinary shares during the Relevant Period and suffered losses as a result of the violations set forth herein.

**B. Defendants**

26.   BP is a United Kingdom corporation with its principal executive offices located at St James's Square, London SW1Y 4PD, United Kingdom. BP's ADS trade on the NYSE under the ticker "BP." BP's ordinary shares trade on the London Stock Exchange ("LSE").

27.   BP America, Inc. ("BP America"), a wholly-owned subsidiary of BP, is a Delaware corporation with its principal place of business in Houston, Texas. BP America produces oil and natural gas products in the United States.

28.   BP Exploration & Production, Inc. ("BP Exploration"), a wholly-owned subsidiary of BP, is a Delaware corporation with its principal place of business in Houston, Texas. BP Exploration operates as a subsidiary of BP America. As set forth herein, BP Exploration issued materially false and misleading statements in MMS filings during the Relevant Period. Among other things, the Macondo IEP states that "BP Exploration & Production Inc. *has the capability, to respond, to the maximum extent practicable, to a worst-case discharge*, or a substantial threat of such a discharge, resulting from the activities proposed in our Exploration Plan."

29.   Hayward was BP's CEO beginning in May 2007 and previously worked as an executive director of BP since 2003. When Hayward assumed the CEO position, he vowed to focus "like a laser" on safety. During the Relevant Period, Hayward signed BP Annual Reports that contained materially false and misleading information, and he made other materially false and misleading statements as alleged herein. Hayward made several misstatements from Houston and operated from Houston in the wake of the Deepwater Horizon disaster. On July 27,

2010 BP announced that Hayward would step down as the Company's CEO effective October 1, 2010. He remained on the BP board until November 20, 2010.

30. Suttles served as BP's Chief Operating Officer for Exploration and Production from January 2009 until at least January 2011. As noted by the *Telegraph*, "Suttles was the face of operational briefings during the [Gulf] spill and led the technical response to stopping the oil leak." During the Relevant Period, Suttles made materially false and misleading statements as alleged herein. On January 12, 2011, Suttles announced his retirement from BP.

31. H. Lamar McKay ("McKay") has served as Chairman and President of BP America since January 2009. Since 1998, McKay has worked for BP in various capacities, including as the Head of Strategy and Planning for Worldwide Exploration and Production, the Business Unit Leader for the Central North Sea in Aberdeen, Scotland, and the Chief of Staff for worldwide Exploration and Production. In May 2007, McKay became the Senior Group Vice President of BP and Executive Vice President of BP America, in which capacity he led BP's negotiations on the settlements for both the Texas City refinery disaster and Prudhoe Bay, Alaska pipeline oil spills. McKay is a member of BP's executive management, which is responsible for the day-to-day running of BP. During the Relevant Period, McKay made materially false and misleading statements as alleged herein.

32. Bryon E. Grote ("Grote") served as the Company's Chief Financial Officer ("CFO") from 2002 through 2011 and as a director of the Company since 2000. He previously worked as an Executive Vice President of Exploration and Production. Grote is a member of BP's executive management, which is responsible for the day-to-day running of BP. During the Relevant Period, Grote signed BP's Annual Reports containing materially false and misleading information as alleged herein.

33.     David Rainey ("Rainey") served as BP America's Vice President of Gulf of Mexico Exploration from April 2005 through June 2010.  During the Relevant Period, Rainey made materially false and misleading statements as alleged herein.

34.     Robert "Bob" Dudley ("Dudley") has served as BP's CEO since October 2010 (replacing Hayward) and as an executive director since April 2009.  He is a member of BP's executive management, which is responsible for the day-to-day running of BP.  During the Relevant Period, Dudley made materially false and misleading statements as alleged herein.

35.     Robert "Bob" Malone ("Malone") served as Chairman and President of BP America and as an Executive Vice President of BP from July 2006 until his retirement in February 2009.  Malone served on BP's executive management team, which is responsible for the day-to-day running of BP.  During the Relevant Period, Malone made materially false and misleading statements as alleged herein.

36.     Defendants Hayward, Suttles, McKay, Grote, Rainey, Dudley and Malone are collectively referred to hereinafter as the "Individual Defendants."  The Individual Defendants, because of their high-level positions with BP or BP America, possessed the power and authority to control the contents of BP's SEC filings, press releases and presentations to securities analysts, money and portfolio managers and institutional investors.  Each of the Individual Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their high-level positions and access to material non-public information, as detailed below, each of the Individual Defendants knew, were reckless in not knowing, or were negligent in not knowing, that the undisclosed risks had been concealed from the investing public, as further detailed below, and that other

affirmative representations regarding BP's safety practices and procedures were materially false and misleading when made.

37.     BP, BP America, BP Exploration and the Individual Defendants are collectively referred to herein as the "Defendants."

## IV.     SUBSTANTIVE ALLEGATIONS

38.     Prior to the Deepwater Horizon explosion and the resulting environmental catastrophe, BP had been at the epicenter of numerous other catastrophic events, including oil drilling blowouts in the Gulf in 2002 and 2003 and in the Nile delta in 2004.  These incidents were followed by a catastrophic explosion at the Company's oil refinery at Texas City in 2005, and disastrous oil spills in Prudhoe Bay, Alaska in 2006.

39.     In the wake of these calamities, BP assured investors that it was committed to implementing safety procedures to avoid preventable incidents, and on January 16, 2007, BP released the Baker Report which criticized weaknesses in BP's process safety culture.  However, the Baker Report provided Defendants specific recommendations for improving process safety leadership, systems, expertise and oversight of process safety performance within BP.

40.     BP assured investors that the Company was committed to implementing the specific process safety recommendations detailed in the Baker Report.   By implementing the Baker Report's recommendations, BP could represent to investors that it was improving the Company's risk profile and was taking steps to avoid the reoccurring environmental and safety disasters it faced over the preceding years.

### A.     Prior Disasters Result In The Baker Report

41.     On March 23, 2005, a fire and explosion occurred at BP's Texas City refinery in Texas City, Texas, killing 15 workers and injuring more than 170 others.  The disaster led to a series of investigations from government regulators and resulted in BP pleading guilty to one

12

13

felony count and paying $50 million in criminal fines for the unlawful release of air pollutants during and after the explosion, amounting to the largest fine for Texas Clean Air Act violations at a single facility.   In October 2009, the Occupational Safety and Health Administration ("OSHA") issued an $87.4 million civil penalty – the largest in its history – against BP for process safety management violations for failing to correct safety problems at its Texas City refinery.

42.    The investigations following the disaster at Texas City revealed that BP was notified of deteriorating safety conditions at the plant months before the explosion, but did nothing to remedy them.  For example, an October 29, 2006 report on *60 Minutes* revealed "evidence that Texas City's own plant manager, Don Parus, was dismayed by unsafe conditions at the refinery and even tried to get the attention of his bosses in London.  He showed them a report revealing that most workers at the refinery felt the plant was unsafe: one worker wrote 'the equipment is in dangerous condition and this is not taken seriously.' Another wrote 'this place is set up for a catastrophic failure.'"

43.    Despite the warnings, BP continued cost cutting measures at Texas City. According to a BP employee interviewed for a 2006 article in *Fortune*, "'The mantra was, Can we cut costs 10%?' he recalls. At Texas City, even money for painting and external corrosion control was tight - until leaks started appearing.' *There was an it-can't-happen-here mentality* on the part of middle management. . . .'"

44.    On May 12, 2005, BP released an interim report on the Texas City explosion. The interim report suggested that the disaster was preventable with proper protocols (or proper process):

Supervisory staff did not verify that the correct procedure was being used or followed, and were absent from the unit during shift relief, and key stages of the

14

startup. There was a lack of clarity around who was supervising the startup. Although the startup procedure was not up-to-date, *if the procedure had been followed, or if one of several possible interventions had been made earlier, this incident would not have happened.*

45.     The interim report proposed a number of corrective measures to prevent future accidents. BP released the final report on December 9, 2005.

46.     Concurrently with the settlement of charges relating to the Texas City explosion (*see* ¶41, *supra*), BP settled charges relating to two oil leaks in Alaska. The leaks occurred in March and August of 2006, and according to the United States Department of Justice ("DOJ"), "[were the result of BP[]'s failure to heed many red flags and warning signs of imminent internal corrosion *that a reasonable operator should have recognized*. The first pipeline leak, discovered ... on March 2, 2006, resulted in more than 200,000 gallons of crude oil spreading over the tundra and reaching a nearby frozen lake, where oil spread out onto the ice along one shore. It was the largest [oil] spill to occur on the North Slope. The second leak occurred in August of 2006, but was ... contained after leaking approximately 1,000 gallons of oil. Nevertheless, the second leak led to the shutdown of Prudhoe Bay oil production on the eastern side of the field."

47.     According to a May 4, 2010 article in *ProPublica* entitled "Congressmen Raised Concerns About BP Safety Before Gulf Oil Spill," Congressional hearings following the 2006 Alaskan oil spills accused BP's management of implementing "'*draconian' budget cuts* that affected safety and health, including limiting the use of a corrosion inhibitor inside the pipeline, a step that could have prevented the deterioration that led to the 2006 spill." An October 31, 2006 article by *Fortune* entitled "Can BP bounce back?," suggested that BP proceeded with budget cuts after being warned in 2002 about a problem with the pipeline.

48.     The DOJ eventually imposed a $20 million fine on BP for the Prudhoe Bay oil spills. The fine was accompanied by BP's Alaska subsidiary entering into a criminal plea agreement with the DOJ for a misdemeanor violation of the U.S. Federal Water Pollution Control Act.

49.     Ronald J. Tenpas, Acting Assistant Attorney General, stated, "The Texas and Alaska cases illustrate the twin pillars of environmental enforcement: first, protecting human life and health and, second, protecting our natural resources . . . . *BP cut corners with disastrous consequences for both and is being held to account.*"

50.     The Texas City and Prudhoe Bay disasters were not isolated events unrelated to one another. During a Congressional hearing in May 2007, U.S. Chemical Safety and Hazard Investigation Board ("CSB") Chairman Carolyn W. Merritt informed Congressional leaders that she found "'*striking similarities*' between the causes of the fatal BP accident in Texas City, Texas, in 2005, and the company's pipeline failure at Prudhoe Bay, Alaska, in 2006. . . ." *See* "CSB Chairman Merritt Tells House Subcommittee of 'Striking Similarities' in Causes of BP Texas City Tragedy and Prudhoe Bay Pipeline Disaster," CSB (May 16, 2007), available at http://www.csb.gov/newsroom/detail.aspx?nid=190. According to CSB:

While the CSB did not investigate the Prudhoe Bay accident, Chairman Merritt was asked by the House Committee on Energy and Commerce Subcommittee on Investigations and Oversight to review a BP internal audit of the accident completed by Booz Allen Hamilton. Chairman Merritt told the subcommittee, "*Virtually all of the seven root causes identified for the Prudhoe Bay incidents have strong echoes in Texas City.*" These included, she said, the "*significant role of budget and production pressures in driving BP's decision-making – and ultimately harming safety.*"

51.     Chairman Merritt's comments portrayed common core issues cutting across BP's operations as the source of the Company's safety lapses.

52.     As set forth in Section V, *infra*, BP's statements after the release of the Baker Report, among other things, assured investors that BP was making progress implementing the "process safety" focused recommendations in the Baker Report.  The Company's reformative message regarding the progress it was making in implementing the Baker Report's recommendations was effectively nothing more than a public relations campaign designed to resuscitate the Company's tarnished safety image in the face of the Texas City and Alaska disasters and which was necessary for BP's continued financial success.

**B.      The Baker Report**

53.     The Texas City disaster led BP to commission the Baker Panel, to study the explosion after, as explained in the Company's 2006 Form 20-F (filed with the SEC on March 6, 2007), the CSB "issued an urgent recommendation to BP [in August 2005] to establish an independent panel to assess and make recommendations regarding BP's corporate oversight of safety management systems at its five US refineries and its corporate safety culture."  The ensuing report from the Panel, the Baker Report, was released to investors on January 16, 2007, and included the following general guidelines:

> The Code of Conduct provides a starting point for the conduct expected of BP employees.  All employees must follow the Code of Conduct, and supervisors must also promote, monitor, and enforce compliance with it.  The Code of Conduct contains a two-page section addressing the health- and safety-related conduct of all BP employees and anyone else working at BP facilities.  It provides that *"[n]o activity is so important that it cannot be done safely"* and emphasizes that "[s]imply obeying safety rules is not enough.  BP's commitment to safety means each of us needs to be alert to safety risks as we go about our jobs."

54.     The Baker Report further noted that "[b]ased on its review, the Panel believes that **BP has not provided** effective process safety leadership and **has not adequately established** *process safety* as a core value across all its five U.S. refineries."  Moreover, as described by the Presidential Commission (defined above), "[The Baker Panel] found that BP management had

not distinguished between workplace occupational safety—concern over slips, sprains, and other workplace accidents—and process safety: hazard analysis, design for safety, material verification, equipment maintenance, and process-change reporting.  And the [P]anel further concluded that **BP was not investing leadership and other resources in managing the highest risks."**

55.    In order to remedy issues that led to repeated safety violations that culminating in catastrophic events – such as the Texas City disaster – the Baker Report provided BP ten specific recommendations to improve the Company's process safety profile (and thereby lower its risk profile):

**RECOMMENDATION # 1 – PROCESS SAFETY LEADERSHIP**

The Board of Directors of BP p.l.c., BP's executive management (including its Group Chief Executive), and other members of BP's corporate management must provide effective leadership on and establish appropriate goals *for process safety.* Those individuals must demonstrate their commitment to process safety by articulating a clear message on the *importance of process safety and matching that message both with the policies they adopt and the actions they take.*

**RECOMMENDATION #2 – INTEGRATED AND COMPREHENSIVE PROCESS SAFETY MANAGEMENT SYSTEM**

BP should establish and implement an integrated and comprehensive process safety management system that systematically and continuously identifies, reduces, and *manages process safety risks* at its U.S. refineries.

**RECOMMENDATION #3 – PROCESS SAFETY KNOWLEDGE AND EXPERTISE**

BP should develop and implement a system to ensure that its executive management, its refining line management above the refinery level, and all U.S. refining personnel, including managers, supervisors, workers, and contractors, possess an appropriate level of *process safety knowledge and expertise.*

**RECOMMENDATION #4 – PROCESS SAFETY CULTURE**

BP should involve the relevant stakeholders to develop a positive, trusting, and open *process safety culture* within each U.S. refinery.

## RECOMMENDATION #5 – CLEARLY DEFINED EXPECTATIONS AND ACCOUNTABILITY FOR PROCESS SAFETY

BP should clearly define expectations and strengthen *accountability for process safety performance* at all levels in executive management and in the refining managerial and supervisory reporting line.

## RECOMMENDATION #6 – SUPPORT FOR LINE MANAGEMENT

BP should provide more effective and better coordinated *process safety support* for the U.S. refining line organization.

## RECOMMENDATION #7 – LEADING AND LAGGING PERFORMANCE INDICATORS FOR PROCESS SAFETY

BP should develop, implement, maintain, and periodically update an integrated set of leading and lagging performance indicators for more effectively monitoring the *process safety* performance of the U.S. refineries by BP's refining line management, executive management (including the Group Chief Executive), and Board of Directors. In addition, BP should work with the U.S. Chemical Safety and Hazard Investigation Board and with industry, labor organizations, other governmental agencies, and other organizations to develop a consensus set of leading and lagging indicators for *process safety* performance for use in the refining and chemical processing industries.

## RECOMMENDATION #8 – PROCESS SAFETY AUDITING

BP should establish and implement an effective system to *audit process safety* performance at its U.S. refineries.

## RECOMMENDATION #9 – BOARD MONITORING

BP's Board should monitor the implementation of the recommendations of the Panel (including the related commentary) and the ongoing *process safety* performance of BP's U.S. refineries. The Board should, for a period of at least five calendar years, engage an independent monitor to report annually to the Board on BP's progress in implementing the Panel's recommendations (including the related commentary). The Board should also report publicly on the progress of such implementation and on BP's ongoing process safety performance.

## RECOMMENDATION #10 – INDUSTRY LEADER

BP should use the lessons learned from the Texas City tragedy and from the Panel's report to transform the company into a recognized industry *leader in process safety management*. The Panel believes that these recommendations . . . can help bring about sustainable improvements in process safety performance at all BP U.S. refineries.

*See* Baker Report, p. xvi-xvii.

56. BP accompanied the release of the Report by assuring investors such as Plaintiffs that BP was prepared to implement the recommendations set forth by the Baker Panel. For example, on January 16, 2007 BP issued a press release entitled "BP will Implement Recommendations of Independent Safety Review Panel." The press release, issued from Houston, stated, in relevant part:

HOUSTON - BP p.l.c. *will implement* the recommendations made by an independent safety review panel as part of the company's continuing effort to improve its safety culture and to strengthen and standardize process safety management at BP's five U.S. refineries.

BP *already has taken a number of actions* which align with the recommendations of the BP US Refineries Independent Safety Review Panel and will, after a more thorough review, develop plans for additional action at its U.S. refineries and for applying lessons learned elsewhere.

In a report made public today, the Panel identified material deficiencies in process safety performance at BP's U.S. refineries and called on BP to give process safety the same priority BP has historically given personal safety and environmental performance. *The Panel made recommendations for improving BP's process safety leadership, systems, expertise and oversight of process safety performance.*

John Browne said: "I want to thank Secretary Baker and the other Panel members for their effort, their insights and their recommendations," Browne said. "We asked for a candid assessment from this diverse group of experts and they delivered one. We will use this report to enhance and *continue* the substantial effort already underway to improve safety culture and process safety management at our facilities."

* * *

"Many of the Panel's recommendations are consistent with the findings of our own internal reviews," said Browne. "As a result, we have been *in action on many of their recommendations for a year or more.* Our progress has been encouraging but there is much more to do. Members of our refining leadership team will be meeting with the Panel within the week to address how best to implement these recommendations.

"I share the Panel's confidence in BP's refining workforce," Browne added. "They are, as the Panel stated, ready, willing and able to participate in a sustained

20

*effort to move BP towards process safety excellence. As I told the Panel, I intend to ensure BP becomes an industry leader in process safety management and performance. We will want to do everything possible to prevent another tragedy like the one that occurred at Texas City.*"

57.     On February 7, 2007, Hayward, who was at the time transitioning to become BP's CEO, reassured investors that he and BP would remain focused on reforming BP's operations to implement better safety processes.  Consistent with the assurances provided by BP with the release of the Baker Report, Hayward told investors that his "priority is simple and clear, it is to implement our strategy by focusing like a laser on safe and reliable operations."

58.     On March 23, 2007, CSB issued its report on the Texas City disaster.  Among other things, the CSB report chided BP for maintaining a culture where employees were discouraged from raising problems with managers.  According to the report, "BP Texas City lacked a reporting and learning culture. Reporting bad news was not encouraged, and often Texas City managers did not effectively investigate incidents or take appropriate corrective action."  The CSB report further detailed efforts by Company officials to cut safety funding by 25% despite three years of mounting safety warnings.  According to a March 20, 2007 article about the CSB report in *Bloomberg*, "'[d]ecisions to cut budgets were made at the highest levels of BP Group despite serious safety deficiencies at Texas City,' the agency said in its final report on the accident's causes.  Cost-cutting 'left the Texas City refinery vulnerable to a catastrophe.'"  BP agreed to consider the CSB's recommendations but "*disagree[d] strongly* with parts of the report."

59.     In October 2007, the DOJ announced that it had entered into a criminal plea agreement with BP related to the Texas City explosion and fire.  On February 4, 2008, BP pleaded guilty, pursuant to the plea agreement, to one felony violation of the risk management planning regulations promulgated under the US federal Clean Air Act.  In connection with the

plea agreement, BP paid a $50 million criminal fine and was sentenced to three years' probation. In October 2009, OSHA issued an $87.4 million civil penalty – the largest in OSHA's history – against BP for alleged process safety management violations.

### C.     BP Retaliates Against Workers

60.     The CSB's findings that BP maintained a culture where employees were *discouraged* from raising problems with managers, as noted above, persisted during the Relevant Period.

61.     For example, a former BP employee, Kenneth Abbott, filed a lawsuit in federal court seeking to shutdown BP's "Atlantis" platform for operating without properly approved plans. Atlantis is a deepwater platform operating in the Gulf of Mexico and is responsible for approximately 14% (or 54,000 barrels per day) of BP's deepwater output from the Gulf. Abbott alleges that BP terminated his employment after he alerted senior managers (in 2008) about Atlantis operating without proper plans.

62.     According to Abbott's lawsuit, "hundreds if not thousands of documents" relating to Atlantis' construction and operation were not approved by regulators, as required. Abbott claims that "BP managers recognized the gravity of this problem" because "using the incomplete, unapproved drawings, 'could lead to catastrophic Operator errors due to their assuming that the drawing is correct. Turning over incomplete drawing to the Operator for their use is a fundamental violation of basic Document Control, the IM Standard[,] and *Process Safety Regulations.*'"

63.     As noted in a May 17, 2010 article in *ProPublica*, Abbott alleges that BP willfully ignored his warnings "and instead emphasized saving money." Congress ordered the MMS to investigate Mr. Abbott's allegations.

64.     Separately, "[a]n independent firm hired by BP wrote in an April [13, 2010] letter that it had substantiated" Abbott's allegations. *See* Juliet Eilperin, "Substantial safety concerns raised about the Atlantis, another BP oil rig," *Washington Post* (May 15, 2010). Billie Pirner Garde, a deputy ombudsman, wrote to Abbott and stated that "The concerns that you expressed regarding the status of the drawings upgrade project were not unique to you . . . It was a challenge to the Project and of concern to others who raised the concern before you worked there, while you were there and after you left." *Id.*

D.      **BP Experienced Well Blowouts During The Relevant Period As The Result Of Faulty Cementing**

65.     Prior to the Relevant Period, BP knew or recklessly disregarded risks associated with the failure of cementing throughout the offshore well development process, from the cementing of well casings into the surrounding seafloor to the plugging of wells during the "temporary well abandonment" phase.

66.     BP was aware, but failed to disclose to the investing public, that as early as 2003, MMS had concluded in a safety alert that cementing failures had contributed to 33 blowout or "well kick" (where oil and gas flows into the wellbore) incidents in the Gulf since 1973 (including 13 since 1995). MMS had further determined that some of these incidents involved "cratering," "well loss" or "rig and platform destruction by fire." The MMS safety alert also noted that "[a]nnular flow related to cementing surface casing has been identified as one of the most frequent causes of loss of control incidents in the Gulf of Mexico."

67.     Prior to and during the Relevant Period, BP had firsthand knowledge of cementing failures affecting its operations and was aware of similar incidents that had impacted other companies' operations. BP's experience with cementing failures included a September 17, 2008 gas leak at its Central Azeria platform in the Azeri-Chirag-Guneshi ("ACG") field off the

coast of Azerbaijan in the Caspian Sea. While the incident went undisclosed to the investing public, a U.S. embassy cable released by WikiLeaks, and reported on by *The Guardian* on December 15, 2010, revealed that as a result of "the blowout of a gas-injection well there was 'a lot of mud' on the platform" and 211 platform workers were evacuated. The diplomatic cable further noted that "[g]iven the explosive potential, BP was quite fortunate to have been able to evacuate everyone safely and to prevent any gas ignition."

68.     As a result of the Central Azeri blowout, BP suspended most of its operations in the ACG field and reduced production from 900,000 barrels per day to approximately 300,000 barrels per day. A subsequent U.S. embassy cable would reveal that BP "ha[d] closed off a 'few suspect wells' from which they think a bad cement job caused the leaking gas."

69.     BP made no announcement or disclosure of this incident when it occurred in September 2008. Instead, BP's Form 20-F for 2008 (filed with the SEC on March 4, 2009), only referred to the incident as a "subsurface gas release" and failed to disclose the occurrence of a blowout, the near-avoidance of an explosion aboard the platform, and the possibility that "bad cement jobs" had affected a "few [other] suspect wells."

70.     As reported by *The Guardian*, another U.S. embassy cable noted that "BP had been exceptionally circumspect in disseminating information about the ACG gas leak, both to the public and to its ACG partners." Further, the diplomatic cable stated that "some of BP's ACG partners are similarly upset with BP's performance in this episode, as they claim BP has sought to limit information flow about this event." Undisclosed risks associated with BP's willingness to turn a blind eye to cementing issues plaguing its operations would later materialize in the Gulf during the Relevant Period.

24

## E.     The Deepwater Horizon Disaster Establishes That "Process" Safety Improvements Were Not Being Implemented

71.     Against the backdrop of BP's purported implementation of the specific protocols outlined in the Baker Report, BP was simultaneously expanding its operations in the Gulf while touting the region as material to its business success.  In the Company's 2004 annual report (filed with the SEC on June 30, 2005) BP stated, "Deepwater Gulf of Mexico is one of our new profit centres and our largest area of growth in the United States."  Similar statements were made in each of BP's Form 20-Fs filed with the SEC during the Relevant Period.  In addition, the Company's operations in the Gulf have been vital to BP's oil production throughout the Relevant Period, providing approximately 28% of BP's daily oil output (excluding equity-accounted entities) in 2009, up from approximately 16% in 2004.  The Company's 2009 Form 20-F (filed with the SEC on March 5, 2010) declares that "Deepwater Gulf of Mexico is our largest area of growth in the US."

72.     In furtherance of BP's Gulf operations, in March 2008 BP paid approximately $34 million to the MMS for an exclusive lease to drill in Mississippi Canyon Block 252, a nine-square-mile plot in the Gulf of Mexico where the Macondo well is located.

73.     As explained by the Presidential Commission, "[a]lthough the Mississippi Canyon area has many productive oil fields, BP knew relatively little about the geology of Block 252: Macondo would be its first well on the new lease.  BP planned to drill the well to 20,200 feet," understand the geology of the site and to assess whether installing production equipment at the well was warranted.  However, before BP was permitted to drill, federal regulations required BP to file an oil spill response plan with the MMS. *See* 30 C.F.R. § 254.23.

74.     As noted in *BP I*, "MMS regulations require that [an oil spill response plan] include: (1) an emergency response action plan; (2) disclosure of the equipment available to

combat an oil spill; (3) any oil spill response contractual agreements with third-parties; (4)

calculations of worst-case discharge scenarios; (5) a plan for dispersant use in case of a spill; (6)

an in-situ oil burning plan, and (7) information regarding oil spill response training and drills."

2012 WL 432611, at *20 (citation omitted).  The current version of the Company's Regional

OSRP for the Gulf was filed on June 30, 2009.  BP's Regional OSRP estimated the "total worst

case discharge" scenario for the Gulf of Mexico at a range of between 28,033 barrels of oil per

day to *up to 250,000 barrels per day.*

75.     The Regional OSRP also stated that if there was an oil spill in the Gulf, BP (with

subcontractors) had the capacity to recover approximately 491,721 barrels of oil per day,

significantly higher than the projected total worst case discharge estimate for the Gulf (250,000

barrels per day):

Offshore response strategies may include attempting to skim utilizing MSRC &
NRC's Oil Spill Response Vessels (OSRVs), Oil Spill Response Barges
(OSRBs), ID Boats, and Quick Strike OSRVs, *which have a combined derated
recovery rate of 491,721 barrels/day.* Temporary storage associated with the
identified skimming and temporary storage equipment equals 299,066 barrels.

76.     In addition to the Regional OSRP, BP also submitted the Macondo IEP for the

Mississippi Canyon Block 252 to the MMS on March 10, 2009 (the Macondo IEP was dated

February 2009 and received by the MMS on February 23, 2009).  The Macondo IEP provided

the following additional estimate of the worst case spill scenario specific to the Mississippi

Canyon Block 252:

Since BP Exploration & Production Inc. *has the capability to respond* to the
appropriate worst-case spill scenario included in its regional OSRP . . . *and since
the worst-case scenario determined for our Exploration Plan does not replace
the appropriate worst-case scenario in our regional OSRP,* I hereby certify that
BP Exploration & Production Inc. has the capability to respond, to the maximum
extent practicable, to a worst-case discharge, or a substantial threat of such a
discharge, resulting from the activities proposed in our Exploration Plan.

77.    With the Regional OSRP and the Macondo IEP submitted to the MMS, BP began drilling an exploratory well at the Macondo site on October 7, 2009 using the "Marianas" rig. According to the Interior Department Report (defined above), BP moved the Deepwater Horizon to the Macondo well after the Marianas sustained damage during Hurricane Ida in November 2009. The Deepwater Horizon crew resumed drilling operations at Macondo in February 2010.

78.    The Deepwater Horizon was an ultra-deepwater, dynamically positioned, semi-submersible offshore drilling rig leased by BP.

79.    Once the Macondo well was fully drilled, Deepwater Horizon's instructions were to cap the well and wait for engineers to determine how to extract the oil. Deepwater Horizon had drilled 13,000 feet (3,962 meters) below the seafloor at the time of the April 20, 2010 explosion.

80.    The disaster on April 20, 2010 aboard the Deepwater Horizon followed the same path as the prior disasters that led BP to engage the Baker Panel. As with the disasters before the Baker Report, the April 20, 2010 disaster was the product of corner-cutting, overlooked and disregarded warnings, a lack of oversight, a failure to train employees properly, and long overdue maintenance.

81.    Specifically, the initial accounts and investigations of the April 20 disaster point to a series of missteps by BP officials leading to hurried and incomplete safety testing before the disaster.   On the day of the explosion, Deepwater Horizon had been drilling in the Gulf for 43 days longer than schedules and was approximately $40 million over budget.  *See* David Hammer, "BP was more than $40 million over budget for blown-out well, oil spill hearings show," *The Times-Picayune* (Aug. 26, 2010).

82.    According to a May 27, 2010 article in the *Wall Street Journal* entitled "BP Decisions Set Stage for Disaster," "BP made choices over the course of the project that rendered this well more vulnerable to the blowout. . . . Some of BP's choices allowed it to *minimize costly delays*" in a project weeks behind schedule. For example:

- BP cut short a procedure involving drilling fluid that is designed to detect gas in the well and remove it before it becomes a problem, according to documents belonging to, *inter alia*, BP. The test required circulation of mud for six to twelve hours, BP's circulated mud for 30 minutes.
- In an April 18 report to BP, Halliburton warned that if BP didn't use more centering devices, the well would likely have "a SEVERE gas flow problem." Still, BP decided to install fewer of the devices than Halliburton recommended— 6 instead of 21.
- a BP manager overseeing final well tests apparently had scant experience in deep-water drilling. He told investigators he was on the rig to "learn about deep water?" drilling.
- When mud was removed from the well and cement was being poured in, BP failed to run tests to determine whether the cement was sealing properly. Workers from a company able to perform such tests were sent back to land by BP 12 hours before the explosion.
- BP officials argued with the rig's crew about how mud should be removed from the well on the day of the disaster. BP's view carried the day. BP has admitted a possible "fundamental mistake" in concluding that it was safe to proceed with mud removal, according to a memo from two Congressmen.

83.    According to the *Wall Street Journal*, on the night of the disaster, Deepwater Horizon's crew, following BP's instructions, began to replace the mud in the well with seawater. Around 9:45 pm, the seawater and remaining mud began shooting out of the derrick. Workers on the rig attempted to seal the well. Their efforts came too late. Gas flowing out from the well found an ignition source and exploded on the rig.

84.    The explosion led to an intense fire ultimately causing the Deepwater Horizon to sink 36 hours after the initial blast. As the Deepwater Horizon sank, it pulled a riser connecting

the rig to the BOP causing oil to begin spewing into the Gulf. Moreover, the BOP – the final

protection against a full blown spill – failed.

85.    Rig workers profiled in a *60 Minutes* interview after the explosion stated that the

BOP was damaged one month before the spill and that management was on notice of problems.

According to one witness, a worker on Deepwater Horizon accidently pulled 15 feet of the drill

through the BOP as it was sealed four weeks before the explosion. The witness reported pulling

a "handful of rubber" from the drill. Managers dismissed the witness' concerns.[4]

86.    On May 29, 2010, *The New York Times* published an article entitled "Documents

Show Early Worries About Safety of Rig" based on internal BP documents showing that BP had

specific concerns about the well design and the BOP at the Gulf disaster site more than 11

months earlier and that BP officials expressed concerns about a loss of "well control" as late as

March 2010. According to *The New York Times:*

On June 22 [2009] . . . BP engineers expressed concerns that the metal casing the
company wanted to use might collapse under high pressure. 'This would
certainly be a worst-case scenario,' Mark E. Halfe, a senior drilling engineer at
BP, warned in an internal report. 'However, I have seen it happen so know it can
occur.' The company went ahead with the casing, but only after getting special
permission from BP colleagues because it violated the company's safety policies
and design standards. The internal reports do not explain why the company
allowed for an exception."

87.    In March 2010, BP officials, according to *The New York Times*, acknowledged

"problems on the rig that included drilling mud falling into the formation, sudden gas releases

known as 'kicks' and a pipe falling into the well. BP officials informed federal regulators that

they were struggling with a loss of 'well control.' On at least three occasions, BP records

indicate, the blowout preventer was leaking fluid, which the manufacturer of the device has said

limits its ability to operate properly." *The New York Times* analysis of BP documents "show that

---

[4]   "Blowout: The Deepwater Horizon Disaster," *60 Minutes* (May 16, 2010).

there were serious problems and safety concerns with the Deepwater Horizon rig far earlier than those the company described to Congress" in May 2010.

88.     BP's partners involved in drilling and operation of the Macondo well have directly blamed the Company for the disaster.  For example, Anadarko Petroleum Corp., a minority partner of BP in the well, issued a statement on June 18, 2010, accusing BP of "gross negligence or willful misconduct" in the operation of the Macondo well.  Anadarko's CEO further stated: "The mounting evidence clearly demonstrates that this tragedy was preventable and the direct result of BP's reckless decisions and actions."

89.     According to the Presidential Commission, governmental investigation into the causes of the explosion have concluded that "the Macondo blowout was the product of several individual missteps and *oversights by BP*], among others,] . . . the cumulative risk that resulted from these decisions and actions was both *unreasonably large and avoidable*."

90.     Similarly, the Interior Department Report concluded that

The loss of life at the Macondo site on April 20, 2010, and the subsequent pollution of the Gulf of Mexico through the summer of 2010 were the result of *poor risk management*, last-minute changes to plans, failure to observe and respond to critical indicators, inadequate well control response, and insufficient emergency bridge response training by companies and individuals responsible for drilling at the Macondo well and for the operation of the Deepwater Horizon. *BP, as the designated operator under BOEMRE regulations, was ultimately responsible for conducting operations at Macondo in a way that ensured the safety and protection of personnel, equipment, natural resources, and the environment.*

91.     BP was itself directly involved in reducing the effectiveness of Deepwater Horizon's BOP.  Specifically, in October 2001 BP requested that one of the two blind ram shears on Deepwater Horizon's BOP be removed.  A June 20, 2010 report in the *New York Times* stated that BP's request was made in order to make the BOP more portable.  The risk of having only one blind shear ram rather than two was significant, especially when used by deepwater rigs

given the BOPs in such rigs had a failure rate of 45%. The blind shear ram is intended to be a final preventive mechanism if well control is lost. In the event of well control loss, the blind shear ram could be engaged to slice through the riser and keep hydrocarbons from leaking outside of a well. Thus, BP's decision to retain the Deepwater Horizon, despite knowing that it had asked to remove one of its shears in order to increase portability, is inconsistent with BP's post-Baker Report assurances about increasing process safety. In fact, the October 11, 2004 agreement removing the one of the BOP's shears stated that removing the shears would "reduce the built-in redundancy of the BOP, *thereby potentially increasing [BP's] . . . risk profile.*"

BP's decision to use the Deepwater Horizon (and its single shear BOP) to commence the drilling after BP knew its request to remove one of the ram shears increased the risk to BP was inconsistent with BP's stated commitment to increase process safety as recommended by the Baker Panel.

92.     The circumstances leading to the April 20, 2010 explosion – given the common root causes between this disaster and the disasters in Texas City and Alaska– establishes that the Baker Report's recommendations that the Company publicly (and repeatedly) assured investors it was implementing were not in fact being implemented. Rather, the April 20, 2010 disaster illustrates the same root causes (cost cutting, ignoring warnings, lack of oversight, improper training) leading to the pre-Baker Report accidents which were, according to BP, being remedied by implementing the Baker Report's guidelines. Despite the Company's public assurance, BP was not implementing the process safety guidelines recommended by the Baker Report, and the April 20, 2010 disaster and follow-on misrepresentations were materializations of the risks that BP concealed.

### F.     BP Has No Legitimate Spill Response Plan

93.     In addition to deficient process safety that ultimately led to the Deepwater Horizon explosion, and despite public assurances to the contrary, including those made in its Regional OSRP and well specific response plans (Macondo IEP), BP had no legitimate plan for containing the 250,000 barrel per day in a "worst case" scenario. *See* 30 CFR § 254.23 ("The 'Emergency response action plan' section is the core of the response plan.").

94.     The Regional OSRP and the Macondo IEP grossly misrepresented BP's capabilities to respond to a spill by declaring that "[BP] has the capability to respond to the maximum extent practicable to a worst-case discharge." Other statements in the Macondo IEP further highlight the absence of reasonable of safety processes and the overall reckless approach BP undertook considering the risks of the project and failure to develop an adequate spill response plan for the well. According to the Macondo IEP:

An accidental oil spill that might occur as a result of the proposed operation in Mississippi Canyon Block 252 has the potential to cause *some detrimental effects* to fisheries. However, it is unlikely that an accidental surface or subsurface oil spill would occur from the proposed activities. If such a spill were to occur in open waters of the OCS proximate to mobile adult finfish or shellfish, the effects would likely be sublethal and the extent of damage would be reduced to the capability of adult fish and shellfish to avoid a spill, to metabolize hydrocarbons, and to excrete both metabolites and parent compounds. *No adverse activities to fisheries are anticipated as a result of the proposed activities.*

95.     Contrary to BP's assurances, the oil spill resulted in the closure of 36% of the fisheries in the Gulf.

96.     With respect to the impact on the shoreline of the United States, the Macondo IEP declares that: "*due to the distance to shore (48 miles) and the response capabilities that would implemented, no significant adverse impacts are expected.*" Contrary to BP's assurances, hundreds of miles of coastline were impacted by BP's oil spill and BP was unable (for three months) to offer any legitimate response to address the spill.

32

97.     The Company's separate spill response plan for the Gulf region — a region touted by BP as its "largest area of growth in the US" — is equally deficient as it, among other things, discusses the impact to walruses from an oil spill in the Gulf.  As noted by Rep. Ed Markey during Congressional hearings after the Gulf oil spill, "walruses . . . have not called the Gulf of Mexico home for 3 million years."  The Regional OSRP, as summarized in a June 9, 2010 article in the *Christian Science Monitor* entitled "BP's Gulf oil spill response plan lists the walrus as a local species," contains several other inaccuracies, including:

- Listing Professor Peter Lutz (in BP's 2009 Regional OSRP) as a national wildlife expert when, in fact, Professor Lutz had passed away in 2005.

- Listing the wrong names and phone numbers of several Texas A&M University marine life specialists.

- Listing inaccurate phone numbers for marine mammal stranding network offices in Louisiana and Florida, which are no longer in service.

- "[A]ccording to an Associated Press analysis that details how *BP officials have pretty much been making it up as they go along.* The lengthy [oil spill response] plans approved by the federal government last year before BP drilled its ill-fated well vastly underestimate the dangers posed by an uncontrolled leak and vastly overstate the company's preparedness to deal with one.  Louisiana Gov. Bobby Jindal, reacting to the AP story, said Wednesday he was angry and frustrated. 'Look, it's obvious to everybody in south Louisiana that they didn't have a plan, they didn't have an adequate plan to deal with this spill,' Jindal said. 'They didn't anticipate the BOP (blowout preventer) failure. They didn't anticipate this much oil hitting our coast. From the very first days, they kept telling us, 'Don't worry,' the oil's not going to make it to your coast.'"

98.     Without a legitimate spill response plan in place, BP was forced to implement trial and error tactics to suppress the flow of oil into the Gulf.

99.     Within hours of the initial explosion onboard the Deepwater Horizon, on April 21, 2010, BP initiated efforts to use remotely operated vehicles ("ROVs") to seal off the well.  All of BP's attempts failed.

100.    BP's initial ROV attempts involved a process known as a "hot stab" to apply hydraulic pressure to a control panel for the blind shear ram.  BP's efforts to engage the blind shear ram were futile.  Days later, on May 5, 2010, BP would learn that the hot stab method had no probability of success because the control panel was actually attached to a non-operative test ram.

101.    BP also employed ROVs to cut electrical wires in the hope that the BOP's "deadman switch" would be triggered and attempted to deploy the ram by activating the well's autoshear system (an emergency system that automatically seals the well when the riser disconnects from the BOP).  These efforts were also unsuccessful.

102.    The failed initial efforts to seal the well were followed by additional failures.  Among these efforts was the placement of a "cofferdam," or containment dome, over the larger of the well's leaks.  The cofferdam was fitted with a pipe that was intended to funnel the leaking oil and gas to the surface where a ship, the Discoverer Enterprise, was waiting to collect the oil and gas.  BP anticipated that the cofferdam would collect as much as 85% of the leaking oil.

103.    While BP had previously used cofferdams to control oil spills, they had been intended for shallow water operations and had not been tested under deepwater drilling conditions, where extreme pressure and low temperatures present unique risks.  As a result, BP was forced to modify an existing 100-ton concrete and steel cofferdam in order to use it at the Macondo well.  By May 5, 2010, BP's modifications had been completed and the cofferdam was en route to the oil spill site from Louisiana.

104.    On May 7, 2010, when response crews attempted to lower the cofferdam into place over the leak, gas hydrates (crystal-like substances that form when gas and water are mixed at high pressure and low temperature) began to clog the cofferdam's opening, thereby preventing

34

the crew from properly positioning the cofferdam.  As reported by the Presidential Commission, the gas hydrates presented an additional problem for the response crews:

Because hydrocarbons are lighter than water, the containment dome became buoyant as it filled with oil and gas while BP tried to lower it.  BP engineers told [the Company's] Vice President overseeing the project Richard] Lynch that they had "lost the cofferdam" as the dome, full of flammable material, floated up toward the ships on the ocean surface.  Averting a potential disaster, the engineers were able to regain control of the dome and move it to safety on the sea floor.  In the wake of the cofferdam's failure, one high-level government official recalled Andy Inglis, BP's Chief Executive Officer of Exploration and Production, saying with disgust, "If we had tried to make a hydrate collection contraption, we couldn't have done a better job."

105.    As further noted by the Presidential Commission, the failure of the cofferdam should not have come as a surprise to BP officials:

BP's Suttles publicly cautioned that previous successful uses had been in much shallower water.  BP recognized that chief among potential problems was the risk that methane gas escaping from the well would come into contact with cold sea water and form slushy hydrates, essentially clogging the cofferdam with hydrocarbon ice.  Notwithstanding the uncertainty, BP, in a presentation to the leadership of the Department of Interior, described the probability of the containment dome's success as "Medium/High."  Others in the oil and gas industry were not so optimistic; many experts believed the cofferdam effort was very likely to fail because of the hydrates.

106.    Indeed, as noted by former drilling engineer Bob Cavnar ("Cavnar") in his 2010 book entitled "Disaster on the Horizon," the use of a cofferdam was the "silliest contraption" as it "never made much sense" and was "more for show – to look like they were doing something while they were trying to come up with a real plan." Cavnar would also state in an interview that the cofferdam was "destined to fail" given the "scientific certainty" that gas hydrates would immediately form and clog the cofferdam's opening under deepwater conditions.

107.    As reported by the *New York Times* on May 8, 2010, response crews abandoned the cofferdam on the seafloor next to the leak while, according to Suttles, BP would spend "the next two or three days" deciding how to proceed with efforts to seal the leaks.

108.    BP's next two attempted techniques to halt the flow of oil from the Macondo well, known as "top kill" and "junk shot," involved the pumping of material through the BOP to block the flow of oil and gas from the well.

109.    Specifically, the top kill technique involves pumping heavyweight drilling mud through the BOP and down into the well.  If the density of the drilling mud and the pumping pressure are high enough, the drilling mud will be held in place and will block oil and gas from flowing out through the well.  Similarly, the junk shot technique involves pumping debris like tire pieces, golf balls, and pieces of rope in an effort to obstruct oil flow through the BOP by filling spaces and gaps in the BOP.

110.    It was intended that together, the top kill and junk shot techniques would complement each other and stop the flow of oil and gas.  However, as reported by the Presidential Commission, these techniques, like BP's cofferdam effort, had never been used in deepwater conditions.  Additionally, top kill and junk shot had not been contemplated by BP's Regional OSRP, presented a significant risk of actually increasing the amount of oil flowing out of the well if the drilling mud further damaged the well, and were unlikely to quickly contain the flow of oil and gas.  Indeed, these two techniques had previously taken approximately 290 days to control the Ixtoc I oil spill that occurred in shallow waters in 1979 when a semi-submersible oil rig exploded and resulted in the release of millions of gallons of oil and gas into the Gulf.

111.    When BP began its top kill and junk shot operations on May 26, 2010, it presented conflicting messages of the likelihood of success.  Hayward represented that the Company estimated the chance of success at between 60 and 70 percent while, as noted by the Presidential Commission, "[o]ne MMS employee estimated that probability as less than 50 percent, while a BP contractor said that he only gave the top kill a 'tiny' chance to succeed."

112.    Over the course of three days, BP proceeded to pump heavy drilling mud at rates in excess of 65 to 70 barrels per minute into the BOP as drilling mud and oil and gas continued to flow back out of the well. BP also employed numerous "junk shots" to attempt to plug the leak. Nonetheless, these efforts failed to make progress and Suttles admitted that "[t]he repeated pumping, we don't believe, will likely achieve success so at this point it's time to move to the next option."

113.    According to the Presidential Commission, BP presented the risk of a possible collapse of rupture disks in the well's 16-inch casing as the most likely explanation for the failure of top kill. However, the Presidential Commission noted that it "did not fully accept BP's analysis of what happened" and, instead, attributed the top kill's failure to the fact that BP did not pump heavy drilling mud into the well at a high enough rate because "the rate at which oil was flowing from the well was many times greater than the then-current 5,000 barrels-per-day estimate."

114.    Following the failures of the top kill and junk shot efforts, BP again sought the use of a technique not previously discussed in BP's Regional OSRP—the employment of a "top hat" collection device that would funnel oil via a new riser to the Discoverer Enterprise at the surface. As announced on May 29, 2010, in order to install the top hat, BP would use ROVs to cut off the portion of the damaged riser that was still attached to the BOP.

115.    Nearly fifty days after the Deepwater Horizon explosion, BP had installed the top hat collection device and the Discoverer Enterprise was collecting approximately 15,000 barrels of oil per day — just 25% of the amount of oil being released into the Gulf of Mexico.

116.    Concurrently, BP successfully implemented an additional method of channeling oil and gas to the surface through the BOP's choke line. Once collected at the surface by a

vessel known as the Q4000, oil and gas were burned off.  Like the Company's other post-spill

efforts, this technique had not been addressed in BP's OSRP filings with the MMS.

117.   Given these limited successes, the Presidential Commission reported that BP had

been "overly optimistic about the percentage of oil it could remove or collect."  Specifically, the

Presidential Commission noted that:

On June 1, Suttles said that he expected the top hat, when connected to the
Discoverer Enterprise, to be able to collect the 'vast majority' of the oil. While
the Company was seeking a solution to suspend the flow of oil

Within days, it became apparent that the top hat and Discoverer Enterprise were
inadequate.

On June 6, Hayward told the BBC that, with the Q4000 in place, "we would very
much hope to be containing the vast majority of the oil." But when the Q4000
came online in mid-June, the two vessels' joint capacity of 25,000 barrels per day
was still insufficient.

118.   As reported by the Presidential Commission, BP's failure to adequately respond

to the oil spill was impacted by BP's refusal to seek assistance:

BP's Lynch said that the speed at which the company brought capacity online was
limited solely by the availability of dynamically positioned production vessels.
One senior Coast Guard official challenged BP's definition of availability: he
suggested that BP did not consider options such as procuring ships on charter with
other companies until the government pushed it to do so. Obtaining another
production vessel might have enabled BP to collect oil through the BOP's kill line
at a rate comparable to that of the Q4000.

119.   On June 2, 2010, the *Financial Times* published an article entitled "BP 'not

prepared' for deep-water spill."  In this article, the *Financial Times* reported that Hayward

essentially admitted that BP's spill response plans were ineffective.  The article stated, in

relevant part: "BP did not have all the equipment needed to stop the leak from its Macondo well

in the Gulf of Mexico in the aftermath of the explosion on an oil rig six weeks ago, the UK

company's chief executive admitted." The article also quotes Hayward admitting that "What is

undoubtedly true is that we did not have the tools you would want in your tool-kit. . . ."

38

According to the article, Hayward further accepted it was "an entirely fair criticism" to say the Company had not been fully prepared for a deep-water oil leak.

120.    BP's final attempt to stop the flow of oil and gas from the Macondo well was the installation of a "capping stack" that would be placed on top of the BOP and would function in a similar fashion as a BOP. Like the cofferdam, top kill, junk shot, and top hat efforts, the capping stack plan had not been included in BP's Regional OSRP and had not been previously employed in deepwater spill conditions.

121.    The U.S. Coast Guard and the U.S. government became heavily involved in this process given the Company's prior failures. As noted by the Presidential Commission:

The [U.S.] government[] science advisors would question BP's assumptions, forcing it to evaluate worst-case scenarios and explain how it was mitigating risk. The government saw its pushback as essential because BP would not, on its own, consider the full range of possibilities. According to one senior government official, before the increased supervision, BP "*hoped for the best, planned for the best, expected the best*." [Paul] Tooms, BP's Vice President of Engineering, believed that the government science advisors unnecessarily slowed the containment effort, arguing that scientists consider risk differently than engineers and that BP had had experience in managing risk. BP, however, was not in the best position to tout that expertise: its well had just blown out.

122.    On July 9, 2010, BP was granted authorization from the U.S. Coast Guard to begin the installation of the capping stack, but was required to wait for additional tests and authorization before closing the capping stack.

123.    After installation of the capping stack was completed on July 12, 2010, experts conducted well integrity testing to assess the likelihood that the well had been damaged and that the closing of the well would force oil and gas through the surrounding seafloor rock formations—resulting in potentially widespread leakage.

124.    On July 15, 2010, BP was granted authorization to begin shutting the valves on the capping stack and began additional well integrity tests to monitor the well. After 87 days and

roughly five million barrels of oil had flowed from the well, BP had successfully stopped the

flow of oil and gas into the Gulf.

125.    In the following days, BP sought approval from the U.S. government for a final

capping of the well via a "static kill." The static kill procedure involved pumping heavy drilling

mud into the well in a similar procedure to the top kill. Given that the leakage of oil was well

controlled, the static kill procedure required significantly lower pumping pressures than a top kill

to seal the well. After receiving authorization from the U.S. Government on August 2, 2010, BP

completed the static kill procedure and the U.S. Coast Guard reported on August 8, 2010 that the

cement seal was holding properly.

126.    The static kill stopped the leaking oil but was only a temporary solution. In order

to shutdown the well, BP needed to drill a second well (a relief well) to intersect the source of

the leak and then to plug the primary well with cement. On September 17, 2010, the first relief

well -- which BP had begun drilling in May -- finally intercepted the Macondo well.  On

September 19, 2010, retired Coast Guard Admiral Thad Allen stated that "[t]he Macondo 252

well is effectively dead . . . . We can now state, definitively, that the Macondo well poses no

continuing threat to the Gulf of Mexico."

## V.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE RELEVANT PERIOD

127.    In BP's January 16, 2007 press release announcing the release of the Baker

Report, BP stated, in part: "BP *already has taken* a number of actions which align with the

recommendations of the BP US Refineries Independent Safety Review Panel and will, after a

more thorough review, develop plans for additional action at its U.S. refineries and for applying

lessons learned elsewhere."

128.    The foregoing statement, which caused BP securities to trade at artificially inflated prices, was materially false and misleading because Defendants knew or recklessly disregarded the fact that BP was expanding its deepwater drilling operations without instituting sufficient operational protocols and safety standards necessary to reduce the risk of catastrophic failure, thereby increasing the Company's exposure to risk.  For example, BP failed to institute procedures to reduce the risk of accidents occurring at its rigs, including the Deepwater Horizon, despite being aware of the specific dangers tied to executing cement jobs in the course of deepwater drilling.  Likewise, during the Relevant Period, BP disregarded known risks associated with the use of BOPs and blind shear rams.  Moreover, the fact that the Deepwater Horizon disaster was so similar to prior disasters at Texas City and Prudhoe Bay demonstrates that BP was not making progress in implementing the recommendations of the Baker Panel. Additionally, the Presidential Commission found that BP lacked "consistent and reliable risk-management processes."

129.    In its Sustainability Report for 2006 (dated April 2007), BP stated that as part of its operating management system ("OMS"), "We document and rigorously follow procedures for safe and effective operating."  The Sustainability Report was publicly released by BP on May 9, 2007.

130.    The foregoing statement, which caused BP securities to trade at artificially inflated prices, was materially false and misleading because BP was retaliating against workers who reported safety violations through the Company's established procedures and channels, including, for example, firing one employee for engaging in whistleblower activities with respect to the Atlantis rig.  The Company's retaliatory actions against workers who reported safety issues rendered its statement about "rigorously follow[ing] procedures" materially misleading.

131.    On May 16, 2007, Malone testified before the U.S House of Representatives Committee on Energy and Commerce, Subcommittee on Oversight and Investigations.  In his written statement to the Committee, Malone stated, in part:

I continue to meet with employees to reinforce my expectations of them: that they must ensure that our operations are safe, that they understand they have both a right and responsibility to shut down any process they feel is unsafe or operationally unsound, and that they are encouraged to raise concerns on any issue.

*        *        *

BP does not tolerate retaliation against workers who raise safety concerns.

132.    The foregoing statement, which caused BP securities to trade at artificially inflated prices, was materially false and misleading because BP was retaliating against workers who reported safety violations through the Company's established procedures and channels, including, for example, firing one employee for engaging in whistleblower activities with respect to the Atlantis rig.  The Company's pattern of retaliatory actions against workers who reported safety issues rendered its statement that "BP does not tolerate retaliation against workers who report safety concerns" false when made.

133.    On October 25, 2007, BP issued a press release announcing the resolution of various law enforcement investigations, including those relating to the Texas City refinery explosion and the Prudhoe Bay spill. The press release quoted Malone as stating, in part: "[i]n the months and years since these violations occurred, *we have made real progress in the areas of process safety performance and risk management.*"

134.    The foregoing statement, which caused BP securities to trade at artificially inflated prices, was materially false and misleading for the reasons set forth in ¶128. Moreover, the fact that the Deepwater Horizon disaster was so similar to prior disasters at Texas City and

42

Prudhoe Bay demonstrates that BP was not making "real progress in the areas of safety performance and risk management."

135.    On November 8, 2007, Hayward spoke at the Houston Forum about BP's purported commitment to process safety and about the Company's ability to successfully operate at the industry's "frontiers," which included the Gulf of Mexico.  During his presentation, Defendant Hayward stated, in part:  "We continue to implement the roadmap provided to ourselves and the industry by the excellent work of the Baker Panel.  *BP remains absolutely committed to taking these lessons and becoming a world leader in process safety.*"

136.    The foregoing statement, which caused BP securities to trade at artificially inflated prices, was materially false and misleading for the reasons set forth in ¶128.  Moreover, the fact that the Deepwater Horizon disaster was so similar to prior disasters at Texas City and Prudhoe Bay demonstrates that BP was not "implement[ing]" the recommendations of the Baker Panel.

137.    On February 22, 2008, BP released its 2007 Annual Review, which contained statements related to safety and risk management:

Throughout 2007, *BP continued to progress the process safety enhancement programme* initiated in response to the March 2005 incident at the Texas City refinery. *We have made progress across the group on all the recommendations:*

*Leadership – We have consistently communicated that safe and reliable operations are our highest priority.* Our safety and operations audit group was strengthened and completed 28 audits in 2007.

Knowledge and expertise – We established an executive-level training programme, ran process safety workshops and launched an operations academy for site-based staff *to enhance process safety capability.*

138.    The foregoing statement, which caused BP securities to trade at artificially inflated prices, was materially false and misleading for the reasons set forth in ¶128.  Moreover, the fact that the Deepwater Horizon disaster was so similar to prior disasters at Texas City and

43

Prudhoe Bay demonstrates that BP was not making "progress across the group on all recommendations" of the Baker Panel.

139. On February 27, 2008, BP conducted its 2008 Strategy Presentation during a conference call with investors and analysts. Hayward stated, in part: "Notwithstanding this track record, our intense focus on process safety continues. We are making good progress in addressing the recommendations of the Baker Panel and have begun to implement a new Operating Management System across all of BP's operations."

140. The foregoing statement, which caused BP securities to trade at artificially inflated prices, was materially false and misleading for the reasons set forth in ¶128. Moreover, the fact that the Deepwater Horizon disaster was so similar to prior disasters at Texas City and Prudhoe Bay demonstrates that BP was not making "good progress in addressing the recommendations of the Baker Panel."

141. On April 17, 2008, BP held its Annual General Meeting. A transcript of that meeting subsequently posted by BP on its publicly-accessible website demonstrated that during the meeting Hayward stated, in part: "Our intense focus on process safety continues. We are making good progress in addressing the recommendations of the Baker Panel and have begun to implement a new Operating Management System across all of BP's operations."

142. The foregoing statement, which caused BP securities to trade at artificially inflated prices, was materially false and misleading for the reasons set forth in ¶140.

143. On December 17, 2008, Hayward spoke at the HRH Prince of Wales's 3rd Annual Accounting for Sustainability Forum. A transcript of Hayward's speech was subsequently posted by BP on its publicly-accessible website. During the speech, Hayward stated, in part:

44

BP had a number of high-profile safety lapses in recent years, notably in our Texas City refinery, where there was tragic and unacceptable loss of life.

These lapses exposed shortcomings – but they also gave us a huge opportunity to learn and improve the way we operate. We opened ourselves up to scrutiny – and we listened more to our front-line operations people – who, of course, really know what is going on on the ground. And we continuously reported progress against a response plan and against an independent external report.

144.    The foregoing statement, which caused BP securities to trade at artificially inflated prices, was materially false and misleading for the reasons set forth in ¶128. Moreover, the fact that the Deepwater Horizon disaster was so similar to prior disasters at Texas City and Prudhoe Bay demonstrates that BP was not making "progress" on implementing the recommendations of the Baker Panel.

145.    Further, Hayward's statement that BP "listened more to [its] front-line operations people" was materially misleading because BP engaged in a pattern of systematic retaliation against workers who reported safety violations, including terminating one employee for whistle blowing activities related to the Atlantis rig.

146.    In a February 2009 presentation before the Microsoft Global Energy Forum, BP stated, in part: "'We document and rigorously follow procedures for safe and effective operating.'"

147.    The foregoing statement, which caused BP securities to trade at artificially inflated prices, was materially false and misleading because BP was retaliating against workers who reported safety violations through the Company's established procedures and channels, including, for example, firing one employee for engaging in whistleblower activities with respect to the Atlantis rig. The Company's retaliatory actions against workers who reported safety issues rendered its statement about "rigorously follow[ing] procedures" materially misleading.

148.    On February 23, 2009, BP Exploration submitted BP's Macondo IEP for the Mississippi Canyon Block 252 to the MMS. By March 10, 2009, the Macondo IEP was

45

"deemed submitted" by MMS and was available to the public and BP investors. The Macondo IEP made the following representations:

I hereby certify that BP Exploration & Production Inc. has the capability to respond, to the maximum extent practicable, to a worst-case discharge, or a substantial threat of such a discharge, resulting from the activities proposed in our Exploration Plan.

                    *          *          *

An accidental oil spill that might occur as a result of the proposed operation in Mississippi Canyon Block 252 has the potential to cause some detrimental effects to fisheries. However, it is unlikely that an accidental surface or subsurface oil spill would occur from the proposed activities. If such a spill were to occur in open waters of the OCS proximate to mobile adult finfish or shellfish, the effects would likely be sublethal and the extent of damage would be reduced to the capability of adult fish and shellfish to avoid a spill, to metabolize hydrocarbons, and to excrete both metabolites and parent compounds. No adverse activities to fisheries are anticipated as a result of the proposed activities.

                    *          *          *

In the event of an unanticipated blowout resulting in an oil spill, it is unlikely to have an impact based on the industry wide standards for using proven equipment and technology for such responses, implementation of BP's Regional Oil Spill Response Plan which address available equipment and personnel, techniques for containment and recovery and removal of the oil spill.

       149.    The Macondo IEP further stated:

An accidental oil spill from the proposed activities could cause impacts to beaches. However, due to the distance to shore (48 miles) and the response capabilities that would be implemented, no significant adverse impacts are expected. Both the historical spill data and the combined trajectory/risk calculations referenced in the publication OCS EIA/EA MMS 2002-052 indicate there is little risk of contact or impact to the coastline and associated environmental resources.

       150.    The Macondo IEP also made identical statements to those set forth in the immediately preceding paragraph concerning oil spill response capabilities as it relates to protecting wetlands, coastal wildlife, refuges, and wilderness areas.

151.    The foregoing statements, which caused BP securities to trade at artificially inflated prices, were materially false and misleading because BP proved unable to respond to the oil spill following the Deepwater Horizon explosion.  Despite publicly providing worst case damage scenarios significantly higher than the amount of the actual spill that occurred after the Deepwater Horizon explosion.  Moreover, as noted by the Presidential Commission: "Despite [BP's claims that it "could recover nearly 500,000 barrels of oil per day"], the oil-spill removal organizations were quickly outmatched."  Several U.S. Senators commented—and Defendants Hayward and Suttles admitted—that BP did not have "proven equipment and technology" and was instead responding "on an ad hoc basis", "making it up day to day" despite BP's public pre-spill representations that it had "the capability to respond…to a worst-case discharge." Additionally, BP misrepresented that an oil spill would not adversely impact beaches, wetlands and other environmentally sensitive areas.

152.    With respect to the specific representations related to the Mississippi Cannon Block 252, BP knowing or recklessly represented that the Macondo IEP was based on an analysis of the Mississippi site when, in reality, the Macondo IEP contained boilerplate language copied from one or more exploration plans that MMS had previously approved for other drilling sites.

153.    On June 30, 2009, BP publicly filed its revised Regional OSRP.  The response plan was issued by the Gulf of Mexico Strategic Performance Unit based in Houston, Texas.  As set forth therein, the "*TOTAL WORST CASE DISCHARGE*" scenarios for the Gulf ranged from a release of 28,033 barrels of oil per day to 250,000 barrels of oil per day.  With respect to that range, the Regional OSRP stated: (a) an oil spill occurring less than ten miles from the shoreline could create a worse case discharge of 28,033 barrels of oil per day; (b) an oil spill that

occurred greater than ten miles from the shoreline could create a worse case discharge of 177,400 barrels of oil per day; and (c) an oil spill caused by a mobile drilling rig that is drilling an exploratory well could create a worst case discharge of 250,000 barrels of oil per day.

154.    Accordingly, the Regional OSRP represents that BP, its subsidiaries and its subcontractors could recover approximately 491,721 barrels of oil per day (or more than 20.6 million gallons) in the event of an oil spill in the Gulf of Mexico.  BP further claimed in the Regional OSRP that the Company and its subcontractors "maintain the necessary spill containment and recovery equipment to respond effectively to spills."

155.    The foregoing statements, which caused BP securities to trade at artificially inflated prices, were materially false and misleading because BP proved unable to respond to the oil spill following the Deepwater Horizon explosion.  Despite publicly providing worst case damage scenarios significantly higher than the amount of the actual spill that occurred after the Deepwater Horizon explosion, BP's "oil-spill removal organizations were quickly outmatched." Several U.S. Senators commented—and Hayward and Suttles admitted—that BP did not have "proven equipment and technology" and was instead responding "on an ad hoc basis" and was "making it up day to day" despite BP's public pre-spill representations that it had "the capability to respond…to a worst-case discharge."

156.    With respect to the specific representations in the Regional OSRP, most of the content of the report was at best irrelevant and immaterial, having been copied from other websites, and at worst wholly inaccurate, "describ[ing] biological resources nonexistent in the Gulf" and identifying a "wildlife expert" who had died several years prior to the issuance of the Regional OSRP.

157.    On November 19, 2009, Rainey testified before the United States Senate Committee on Energy and Natural Resources. Rainey testified to the following:

Releases from oil and gas operations are rare, and the application of technology has enabled a dramatic reduction of releases from our industry over the last 30 years. To be clear, any release from our operations is unacceptable, and we will continue to invest in research and technology to drive us to our ultimate goal of zero discharge.

158.    Rainy also submitted a written statement the Senate committee which including the following misrepresentations:

Examples of the technologies which have helped to reduce accidental releases include:

• Down hole flow control valves that shut down the well automatically if damage to the surface equipment is detected;

• Blowout preventer technology which includes redundant systems and controls;

• New and improved well control techniques which maintain constant control of the fluids in the wellbore;

• Sensors which continually monitor the subsurface and seabed conditions for sudden changes in well pressures; and

• BP's fiber optic network in the US Gulf of Mexico which allows us to monitor well pressures in real time, both at the facility and in our offices in Houston.

While our intent is to prevent all accidental discharges, we conduct regular emergency drills with local, state, and federal agencies. All of our production facilities have contingency plans that identify the procedures, response equipment, and key personnel needed for responding to incidents.

159.    The foregoing statements, which caused BP securities to trade at artificially inflated prices, were materially false and misleading because BP proved unable to respond to the oil spill following the Deepwater Horizon explosion. Despite publicly providing worst case damage scenarios significantly higher than the amount of the actual spill that occurred after the Deepwater Horizon explosion, BP's "oil-spill removal organizations were quickly outmatched." Several U.S. Senators commented—and Defendants Hayward and Suttles admitted—that BP did

not have "proven equipment and technology" and was instead responding "on an ad hoc basis"

and was "making it up day to day" despite BP's public pre-spill representations that it had "the

capability to respond…to a worst-case discharge."

160.    Additionally, despite reassuring the market just six months before the Deepwater

Horizon disaster that BP had "[b]lowout preventer technology which includes redundant systems

and controls," in fact, BP specifically asked that these redundant systems be removed from the

Deepwater Horizon to speed up testing, including the removal of a second (and recommended)

blind shear ram to counteract any issues with the BOP.

161.    On March 5, 2010, BP filed its 2009 Annual Report with the SEC on Form 20-F,

which was signed by Hayward and Grote.  BP's Form 20-F stated, in part:

> Following the tragic incident at the Texas City refinery in 2005 the [Safety,
> Ethics, and Environment Assurance] committee has observed a number of key
> developments, including: the establishment of a safety & operations (S&O)
> function with the highest calibre of staff; development of a group-wide operating
> management system (OMS) which is being progressively adopted by all operating
> sites; the establishment of training programmes in conjunction with MIT that are
> teaching project management and operational excellence; the dissemination of
> standard engineering practices throughout the group; and the formation of a
> highly experienced S&O audit team formed to assess the safety and efficiency of
> operations and recommend improvements. Throughout this time the group chief
> executive has made safety the number one priority.

162.    The foregoing statement, which caused BP securities to trade at artificially

inflated prices, was materially false and misleading for the reasons set forth in ¶128.  Moreover,

the fact that the Deepwater Horizon disaster was so similar to prior disasters at Texas City and

Prudhoe Bay demonstrates that BP was not making progress in reforming its process safety

mechanisms.

163.    On March 23, 2010, Hayward delivered a speech at the Peterson Institute for

International Economics in Washington, D.C.  BP subsequently posted a transcript of Hayward's

speech on its publicly available website.  During the speech, Hayward stated the following:

Five years ago on this day, fifteen people died and many more were injured, when an explosion tore through our Texas City refinery.

That tragic accident has changed in a profound and fundamental way our approach to safety and operations integrity – providing a safe working environment is a paramount responsibility, and our first and foremost priority.

164.    The foregoing statement, which caused BP securities to trade at artificially inflated prices, was materially false and misleading for the reasons set forth in ¶162.

165.    As noted above, the explosion aboard the Deepwater Horizon occurred on April 20, 2010.

166.    On April 28, 2010, after the markets closed, BP and NOAA held a joint press conference during which Coast Guard leader Rear Admiral Landry stated that NOAA had increased its estimate of the oil flow rate from 1,000 to 5,000 barrels per day. During that same conference, Suttles provided BP's best estimate of the amount of oil flowing from the Macondo well on a daily basis as *1,000 barrels of oil per day*. Suttles also stated, in part:

Late this afternoon, while monitoring the blowout preventer area, which we have done continuously since the event began, we discovered a new point of leak. This leak is just beyond the top of the blowout preventer in the pipe work called the riser. Given the location, *we do not believe this changes the amount currently estimated to be released.*

167.    On April 29, 2010, Suttles conducted interviews with several media outlines, including the Early Show and the Today Show. During his interview on the Early Show, Suttles stated, in part: "I think that somewhere between 1,000 and 5,000 barrels a day is probably the best estimate we have today." Suttles made nearly the same statement during his interview on the Today Show.

168.    The foregoing statements, which caused BP securities to trade at artificially inflated prices, were materially false and misleading because Defendants knew or recklessly disregarded that the Company's "best estimate" of the amount of oil flowing from the well on a

daily basis was more likely 5,758 barrels per day, with a high of 14,266 barrels per day. BP

senior management, including Suttles, received this "best estimate" range by way of two internal

reports dated April 26, 2010 and April 27, 2010, *i.e.*, before Suttles told the market that the oil

flow was 1,000 barrels of oil per day on April 28th and between 1,000 and 5,000 barrels per day

on April 29th.

169.    On May 5, 2010, Hayward conducted an interview with journalists from the

*Houston Chronicle* at BP's offices in Houston.  With respect to the oil flow rate from the

Macondo well, Hayward stated: "A guesstimate is a guesstimate.  And the guesstimate remains

5,000 barrels a day."

170.    The foregoing statement, which caused BP securities to trade at artificially

inflated prices, was materially false and misleading because Defendants knew or recklessly

disregarded that the Company's "best estimate" of the amount of oil flowing from the well on a

daily basis was more likely between 5,758 barrels per day, with a high of 14,266 barrels per day

based on an internal report dated April 27, 2010.

171.    On May 6, 2010, during a speech at the Chief Executives Club in Boston,

Massachusetts, Dudley stated, in part:

At the time of the explosion, the Deepwater Horizon drilling rig had been working for BP for almost nine years. . . . The rig had handled some of the industry's greatest technical challenges, and her safety record had been excellent and had recently won awards.

*        *        *

A Blowout Preventer is used on every oil and gas well drilled in the world today — onshore and offshore.

These mechanisms are regularly inspected and tested. If they don't pass the test, drilling operations are made safe and the system is replaced or repaired and retested.

BOPs are designed to be fail-safe. This Blowout Preventer was not. It failed to close, or to close completely.

172.    The foregoing statement, which caused BP securities to trade at artificially inflated prices, was materially false and misleading because Dudley falsely represented that the Deepwater Horizon's safety record had been excellent when, in fact, there were problems with the rig dating back to 2005.  In fact, four to six weeks before the explosion, a leak developed in the Deepwater Horizon's BOP that was reported to both BP and owner of the rig; instead of effectuating repairs, the faulty part responsible for the leak was switched off. Moreover, four weeks prior to the explosion, chunks of the BOP's rubberized annular preventer had surfaced after a pressure-related incident further indicating that there were operational problems with the BOP, yet nothing was done.   Instead, on March 10, 2010, BP sought and obtained a postponement of MMS's inspection of the BOP.   This was directly contrary to Dudley's representation that the BOPs were "replaced or repaired and retested" when proven faulty. Additionally, Dudley failed to disclose that BP contracted to remove a second blind shear ram, putting the BOP at a higher risk for malfunction and increasing the "risk profile" of the BOP.

173.    During a May 10, 2010 McKay appeared before the Committee On Transportation And Infrastructure and said the following in response to a question about whether "5,000 barrels per day the most accurate" figure for the amount of oil leaking into the Gulf: "[McKay] That is our best estimate. Obviously, it's continually being looked at. As you may know, we've gotten this riser insertion tube to work, and we're getting increased volumes at the surface where we can actually measure. And then, I believe there is a new small task force that has been put together under direction of Unified Command to get all the experts together in a room and try to understand, with the latest available data, is there a more accurate estimate? But

we do recognize there is a range of uncertainty around the current estimate." The following

exchange ensued later during this same hearing:

**[Rep. LAURA A. RICHARDSON]:** . . . . Why is there a disagreement between the total amount of oil that is leaking? BP has said 5,000, other reports are saying otherwise. Why do you think there is a disagreement, and do you stand by your point that it is only 5,000?

**Mr. McKay:** I think there are a range of estimates and it is impossible to measure. That is the reality. What we have been doing with government officials, government experts, industry experts, is trying to come up with the best estimate, and that has been done essentially by understanding what is happening at the surface and trying to understand volume there, adding to it what we believe the oil properties, how it would disperse in a water column as it moves to the surface. And those two added together is the estimated volume. It has been clear from day one there is a large uncertainty range around that.

**Ms. Richardson.** Is it possible it could possibly be the larger number that has been reported?

**Mr. McKay.** It is theoretically possible. *I don't think anyone believes it is quite that high that has been working on this. I believe the uncertainty range is around that 5,000 number, and it could be higher. But if the number you are talking about is 70,000 barrels a day, I don't know this, but I don't think people that are working with it believe that that is a possibility.*

174.   The foregoing statement, which caused BP securities to trade at artificially inflated prices, was materially false and misleading because Defendants knew or recklessly disregarded that the Company's "best estimate" of the amount of oil flowing from the well on a daily basis was more likely between 5,758 barrels per day, with a high of 14,266 barrels per day based on internal reports dated April 26th and April 27th.  Moreover, the actual amount of oil spilling into the Gulf was approximately 60,000 barrels per day — which is significantly closer to the 70,000 barrels per day McKay dismissed as something working on the spill response would not believe.

54

## VI.    SCIENTER ALLEGATIONS

### A.    Hayward Falsely Assured Investors That BP Was Implementing The Baker Report's Recommendations

175.    Throughout the Relevant Period, Hayward was aware or recklessly disregarded that his statements regarding BP's implementation of process safety improvements were untrue and that they omitted material information concerning BP's failure to make adequate progress toward satisfying the recommendations set forth in the Baker Report. Indeed, Hayward's self-proclaimed personal involvement in the Company's prioritization of safety since the beginning of his tenure as CEO establishes that he knew, or was reckless in not knowing, that BP was failing to implement the recommendations in the Baker Report.

176.    Hayward's succession as BP's CEO in May 2007 was touted as an opportunity for BP to make significant progress toward improving process safety within the Company's operations. In fact, following the release of the Baker Report in January 2007, BP held a press conference on January 16, 2007 to discuss the Baker Report's recommendations. In the press release, Browne assured investors that:

If I had to say one thing which I hope you will all hear today it is this 'BP gets it.' And I get it too. This happened on my watch and, as Chief Executive, I have a responsibility to learn from what has occurred. I recognise the need for improvement and that my successor, *Tony Hayward, and I need to take a lead in putting that right by championing process safety as a foundation of BP's operations.*

*              *              *

The list of what we have done since the accident *shows how seriously we take process safety.*

177.    Upon assuming the role of Company CEO in May 2007, Hayward vowed to focus "like a laser" on safety. To this end, Hayward and the Company repeatedly assured investors, through BP's statements and public filings with the SEC, that BP was committed to improving

process safety within the Company's operations, including the critically important oil operations in the Gulf.

178. Indeed, after his first year as the Company's CEO, Hayward assured investors that when he took over as CEO, "the immediate task was to restore the integrity and the efficiency of BP's operations" and that he "set out three priorities: safety, people and performance."

179. Hayward's involvement in improving companywide process safety included chairing BP's Group Operations Risk Committee ("GORC") and serving as executive liaison to the Safety Ethics & Environment Assurance Committee ("SEEAC"). SEEAC was ultimately responsible for ensuring that BP's safety protocols were implemented and complied with. GORC was responsible for reviewing and analyzing safety incidents involving BP's operations and reported to SEEAC.

180. Separately, Hayward implemented a safety course for BP executives known as the BP "Operations Academy." The Operations Academy, which Hayward himself attended, consisted of three two-week sessions at Massachusetts Institute of Technology in which BP executives focused on process safety. As explained in a January 24, 2011 *Fortune* article entitled "BP: An Accident Waiting to Happen," the course taught universal process-safety lessons including that: "Critical procedures should be formalized and carried out with rigor; it's essential to maintain multiple safeguards against an accident; it is dangerous to change operating plans on the fly; anomalies need to be clearly resolved; small incidents are warning signs that conditions are ripe for a disaster."

181. Another critical component of Hayward's plans for improving process safety was the implementation of BP's OMS which was touted as having "an increased focus on process safety and continuous improvement." Indeed, in a speech delivered at the Company's 2008

Annual General Meeting, Hayward stated that the OMS was "aimed at ensuring that our operations across the world look and feel the same everywhere – and perform to the same high standard."

182. Hayward's plans to improve process safety also included the reorganization of the Company to achieve "increased efficiencies." According to Grote, the reorganization efforts were "designed to simplify the organization and improve productivity and accountability, bringing up operating units to enable them to focus on safe, reliable, and profitable operations."

183. In the aftermath of the Macondo spill, Hayward effectively admitted that the successful implementation of process safety improvements during the Relevant Period had failed. On May 3, 2010, Hayward acknowledged that BP was fully responsible for the spill and stated that "It is indeed BP's responsibility to deal with this, and we are dealing with it . . . We will absolutely be paying for the cleanup operation. There is no doubt about that. It's our responsibility – we accept it fully."

184. Similarly, in a June 2, 2010 article entitled "BP 'not prepared' for deep-water spill," the *Financial Times* reported that Hayward "accepted it was 'an entirely fair criticism' to say the company had not been fully prepared for a deep-water oil leak" and acknowledged that it "is undoubtedly true is that we did not have the tools you would want in your tool-kit."

185. Then, in a November 9, 2010 interview with *BBC*, Hayward confessed that BP had failed to develop adequate emergency response plans for oil spills and admitted that the Company was "*making it up day to day.*"

**B. Defendants' Estimates Of Oil Spilling Into The Gulf Are Contradicted By Cotemporaneous Internal BP Documents**

186. Throughout the Relevant Period, Suttles and McKay were aware or recklessly disregarded that their statements regarding estimates regarding the amount of oil spilling into

the Gulf following the Deepwater Horizon explosion were not true and that their statements

omitted material information concerning the true magnitude of the Macondo well oil spill.

187.    For example, an internal BP document (dated April 26, 2010) revealed that the

Company estimated that 5,000 barrels per day were leaking into the Gulf (the following was

linked to May 27, 2010 article published in *The New York Times* entitled "Ruptured BP Well

Tops Valdez as Worst U.S. Spill"):

**2)   Estimated Present Volume Release Rate**

*The following assumptions are used to make a release rate calculation, if any of them are changed, the answer could be significantly different.*

The oil is leaking, in a vertical plume from a hole approximately 40 cm, in diameter.

The velocity of the material in the plume is estimated by visual observation to be between 7 cm/sec and 30 cm/sec.

The plume itself contains gas bubbles, oil droplets, and entrained seawater.

Assuming that 50% of the plume volume is oil and a rise velocity of 15 cm/sec, the oil released from this source would be roughly 5000 bbl/day. (approximately 200,000 gal/day) Other sources would contribute additional oil. This answer will be refined as additional information becomes available.

(emphasis in downloaded version).

188.    Another internal BP document (dated April 27, 2010), also linked to the *New York*
*Times* article in the preceding paragraph, that was provided to BP's senior management revealed

that the Company's low estimate of the oil spill was 1,063 barrels per day, the Company's best

estimate was 5,758 barrels per day and the Company's high estimate was 14,266 barrels per day:

Oil on Water Estimate - Low

Oil on Water Estimate - Best Guess

Oil on Water Estimate - High

Total oil on water

Total emitted

Barrels emitted per day

BP Confidential

(handwriting in downloaded version).

189. As BP's Chief Operating Officer for Exploration and Production and BP's officer in charge of co-managing the spill response with the U.S. Coast Guard, Suttles knew the Company's estimated spill rate from the Macondo well, or was reckless in not knowing. Nonetheless, on April 28, 2010, as reported by the *Huffington Post*, Suttles reiterated earlier estimates that ***1,000 barrels*** of oil from the Macondo well were spilling into the Gulf of Mexico each day. Then, on April 29, 2010, Suttles stated in an interview on *CBS's* The Early Show that

"I think that somewhere between 1,000 and 5,000 barrels a day is probably the best estimate we have today" of the Macondo well spill rate.

190.    Similarly, Hayward, as BP's CEO, knew the Company's April 26, 2010 and April 27, 2010 internal estimates of the spill rate from the Macondo well, or would have been reckless in not knowing about BP's internal reports.  Like Suttles, Hayward ignored the Company's internal estimates and, in a May 5, 2010 Houston Chronicle interview, referred to the Macondo well spill rate by stating that "A **guess**timate is a guesstimate.  And the guesstimate remains 5,000 barrels a day."

191.    Additionally, as reported by the *Times-Picayune* on May 19, 2010, "[a]n engineering professor who has been monitoring the Deepwater Horizon disaster said . . . that '*there is scientifically no chance' that BP's estimate of a discharge of about 5,000 barrels of oil per day into the Gulf of Mexico is anything close to the actual number.*  Steve Wereley, associate professor of mechanical engineering at Purdue University, told the House Energy and Environment Subcommittee that his own review indicates that a 1.2-inch hole is producing about 25,000 barrels of oil a day by itself, and overall the daily spill could amount to something *'short of 70,000 barrels* to as high as 115,000 barrels.'"

192.    In response to Wereley's estimates, "BP America Chief Executive Lamar McKay, denied that his company is trying to obscure the size of the leak.  'This leak is not measurable through technology we know,' he said.  He also told the House Transportation and Infrastructure Committee that anyone working on the spill would have a hard time believing the size is anything close to the 70,000 barrels per day projected last week by Wereley."

193.    As noted herein, 60,000 barrels of oil per day were leaking into the Gulf after the Deepwater Horizon sank.  Coupled with the internal BP estimates received by the Defendants

and Wereley's estimates (based on public information equally accessible to BP), Defendants knew, or at a minimum were reckless in not knowing, that their statements minimizing the spill rate were materially misleading. Here, the Defendants ignored, *inter alia*, contemporaneous reports provided to them undermining the veracity of their public statements.

194.    The facts alleged herein have been previously found to support an inference of scienter as to Hayward and Suttles. *See BP I*, 2012 WL 432611, at **56-58, 60-61. Moreover, McKay possessed or had access to BP's internal reporting when he denied allegations that BP was attempting to obscure the size of the leak. The internal reports show that BP's public statements about the amount of oil leaking from the well were in fact understated.

## VII.    LOSS CAUSATION/ECONOMIC LOSS

195.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs. The price of BP ADSs and ordinary shares significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, materialized, causing a correction in the price of BP ADSs and ordinary shares resulting in Plaintiffs suffering losses. As a result of transactions in BP's securities during the Relevant Period, Plaintiffs suffered damages, under the federal securities laws and Texas common and statutory law.

196.    The relevant truth about BP's operations slowly emerged following the April 20, 2010 explosion on the Deepwater Horizon and BP's failed efforts to control the resulting oil spill. Immediately prior to the explosion, BP's ADS traded at approximately $60.48 per ADS, and its ordinary shares traded at 655.4 pence on the LSE. Following the explosion, BP ADS and ordinary shares began a nearly continuous decline as the artificial inflation created by the Defendants misrepresentations and material omissions was removed from the price of the securities.

197.    Specifically, on April 30, 2010, when the oil slick caused by the disaster reached Louisiana's coastline, BP ADS closed at $52.15 per ADS, a decline of over $8.00 per ADS since April 20, 2010. BP's ordinary shares had declined nearly 80 pence over the period. The declines are directly related to the market absorbing information revealing risks BP concealed throughout the Relevant Period, specifically that the Company conducted its operations in the Gulf without a legitimate spill response plan and that the Company's statements about reforming BP's safety profile were false.

198.    In the days and weeks that followed, additional news and information emerged on a seemingly continuous basis further revealing BP's wanton disregard for conducting its operations in a safe manner and the lack of any legitimate spill response plan by BP. These revelations caused BP's ADSs and ordinary shares to plummet further.

199.    On May 3, 2010, BP claimed responsibility for the cleanup efforts related to the spill, Hayward, stated, "This is not our accident, but it's our responsibility." The Company's ADS fell from $52.15 to $50.19, a decline of 3.8%. The Company's ordinary shares were not traded in London on May 3rd, due to a holiday, but closed at 575.5 pence on April 30, 2010, and opened at 546 pence on May 4, 2010, representing a decline of 5.1%. The decline is directly related to the market absorbing information revealing risks concealed by BP throughout the Relevant Period, specifically that the Company conducted its operations in the Gulf without a legitimate spill response plan and that the Company's statements about reforming BP's safety profile were false.

200.    On May 6, 2010, BP commenced its attempt to contain the spill with a large dome-like structure, to be placed over the Macondo well. On May 8, 2010, BP disclosed that the containment dome efforts had failed. At this time, tar had begun to wash up on the Alabama

coast. On May 10, 2010, BP released a statement updating the public on the Gulf of Mexico oil

spill response and revealed that oil spill costs to date had reached $350 million. In reaction to

this news, BP's ADSs fell from $49.06 per ADS on Friday, May 7, 2010 to close at $48.75 on

Monday, May 10, 2010, a decline of $0.31 per ADS; BP's ordinary shares fell from 553.9 pence

to 549.2 pence per share over the same period. The decline is directly related to the market

absorbing information revealing risks concealed by BP throughout the Relevant Period,

specifically that the Company conducted its operations in the Gulf without a legitimate spill

response plan and that the Company's statements about reforming BP's safety profile were false.

201. On May 12, 2010, *Bloomberg* published an article entitled "BP Tells Congress

Gulf Well Failed Tests Before Blast." The article stated, in relevant part:

A Gulf of Mexico oil well failed a pressure test hours before a drilling rig
exploded last month, an executive for well owner BP Plc told the U.S. House
Energy Committee that's investigating the incident.

Such pressure tests are aimed at ensuring the integrity of cement poured into the
well to keep out natural gas, said Committee Chairman Henry Waxman, a
California Democrat, citing a report to the panel from James Dupree, BP senior
vice president for the Gulf. The tests before the April 20 blast showed
"discrepancies" in pressure levels, Waxman said.

\*          \*          \*

"BP, one of the largest oil companies, assured Congress and the public that it
could operate safely in deep water and that a major oil spill was next to
impossible," Waxman said. "We now know those assurances were wrong."

\*          \*          \*

'Serious Questions'

"BP promised to make safety its number one priority," Stupak said. "This hearing
will raise serious questions about whether BP and its partners fulfilled this
commitment. The safety of its entire operations rested on the performance of a
leaking and apparently defective blowout preventer."

202.    These revelations caused BP ADSs to close at $48.50 per share on May 12, 2010, a decline of $0.24 per ADS from the previous day's closing price and approximately $11.98 per ADS since April 20, 2010. Similarly, BP's ordinary shares in London closed at 541.6 pence that day-down 3.9 pence from the previous day and 113.8 pence (-17.4%) in comparison to April 20, 2010.

203.    On May 13, 2010, *The Wall Street Journal* published an article entitled "Red Flags Were Ignored Aboard Doomed Rig." This article stated, in relevant part:

Managers at oil giant BP PLC decided to forge ahead in finishing work on the doomed Deepwater Horizon rig despite some tests suggesting that highly combustible gas had seeped into the well, according to testimony released by congressional investigators and documents seen by *The Wall Street Journal*.

204.    On May 14, 2010, *The Wall Street Journal* published an article entitled "BP Wasn't Prepared for Leak, CEO Says." This article stated, in relevant part:

BP has been particularly vulnerable to criticism because among the large oil companies it is by far the biggest player in deepwater oil exploration. *Some in the industry have said a company with such a strong focus on deepwater drilling should have had much better contingency plans for dealing with an underwater oil leak at this depth.*

*Mr. Hayward, speaking to a small group of journalists Wednesday night in Houston, admitted the oil giant had not the technology available to stop the leak. He also said in hindsight it was "probably true" that BP should have done more to prepare for such an emergency of this kind.*

"It's clear that we will find things we can do differently, capability that we could have available to deploy instantly, rather than be creating it as we go," he said.

205.    On May 13, 2010, as a result of these continuing revelations about BP's operations, BP ADSs closed at $48.10 per ADS, $0.40 per share below the previous day's closing price. The decline is directly related to the market absorbing information revealing risks concealed by BP throughout the Relevant Period, specifically that the Company conducted its

64

operations in the Gulf without a legitimate spill response plan and that the Company's statements

about reforming BP's safety profile were false.

206.   On May 24, 2010, BP announced that the costs for addressing the Gulf oil spill

had more than doubled, from $350 million to $760 million.  Additionally, BP announced that it

was recovering less oil than it expected.  Finally, pressure on BP continued to grow because the

U.S. government threatened to take over the oil spill response effort because of BP's lack of

progress.  On this news, the Company's ADSs fell from $43.86 per ADS on Friday, May 21,

2010 to close at $41.86 per ADS on Monday, May 24, 2010, a decline of $2.00 per ADS; BP's

ordinary shares fell from 506.7 pence to close at 493 pence on May 24, 2010.

207.   On May 26, 2010, BP began its "top kill" efforts, the goal being to put heavy kill

mud into the well so that it reduced the pressure and then the flow from the well.  However, on

May 29, 2010 (a Saturday), BP revealed that this too had failed.

208.   Also on May 29, 2010, *The New York Times* published an article entitled

"Documents Show Early Worries About Safety of Rig."  This article stated, in relevant part:

> Internal documents from BP show that there were serious problems and safety
> concerns with the Deepwater Horizon rig far earlier than those the company
> described to Congress last week.

> *       *       *

> The documents show that in March, after several weeks of problems on the rig,
> BP was struggling with a loss of "well control." And as far back as 11 months
> ago, it was concerned about the well casing and the blowout preventer.

209.   On June 1, 2010 (the first trading day since the failure of the "top kill" effort),

United States Attorney General, Eric Holder, reported that the DOJ opened formal criminal and

civil probes of BP.  News of the Attorney General's action and BP's inability to cap the well

with its "top kill" procedure sent its ADSs tumbling nearly 15%, to close on June 1, 2010 at

$36.52 per ADS, on heavy trading volume.  Likewise, the Company's ordinary shares fell 64.8

pence over the period to close at 430 pence. This closing price on June 1, 2010 represents a cumulative decline in the value of BP's ADSs of nearly $24.00 per ADS since April 20, 2010, or approximately 40%. Moreover, the decline over this period in BP's ordinary shares was more than 225 pence, representing a decline of more than 34% since the closing price on April 20, 2010. These declines are directly related to the market absorbing information revealing risks concealed by BP throughout the Relevant Period, specifically that the Company conducted its operations in the Gulf without a legitimate spill response plan and that the Company's statements about reforming BP's safety profile were false.

210.    Governmental investigations following the oil spill have primarily blamed BP for the initial explosion and the ensuing oil spill.  For example, the Interior Department Report (dated September 14, 2011) states:

The loss of life at the Macondo site on April 20, 2010, and the subsequent pollution of the Gulf of Mexico through the summer of 2010 were the result of *poor risk management*, last-minute changes to plans, failure to observe and respond to critical indicators, inadequate well control response, and insufficient emergency bridge response training by companies and individuals responsible for drilling at the Macondo well and for the operation of the Deepwater Horizon.

BP, as the designated operator under BOEMRE regulations, *was ultimately responsible* for conducting operations at Macondo in a way that ensured the safety and protection of personnel, equipment, natural resources, and the environment.

211.    The cost of the spill has been highly material.  To date, BP has set aside $37.2 billion to pay spill-related expenses.

## VIII.    APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

212.    Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Relevant Period;

(b) The omissions and misrepresentations were material;

(c) The Company's securities traded in efficient markets;

(d) The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(e) Plaintiffs purchased BP securities during the Relevant Period without knowledge of the misrepresented or omitted facts.

213.    At all relevant times, the market for BP securities was efficient for the following reasons, among others: (a) BP filed periodic public reports with the SEC; and (b) BP regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

## IX.    NO SAFE HARBOR

214.    Defendants' "Safe Harbor" warnings accompanying their forward-looking statements ("FLS") issued during the Relevant Period were ineffective to shield those statements from liability.

215.    The Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of BP who knew that the FLS was false. None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

**X.    COUNTS**

**FIRST CLAIM**

**Violation of Section 10(b) of The Exchange Act and Rule 10b-5 Promulgated Thereunder
Against BP, BP America, BP Exploration, Suttles and McKay (collectively, the
"Section 10(b) Defendants")
(RELATING TO ADS PURCHASES)**

216.    Plaintiffs repeat and reallege each and every allegation contained above as if fully
set forth herein.

217.    During the Relevant Period, the Section 10(b) Defendants disseminated or
approved the false statements specified herein (as attributed to them above), which they knew or
recklessly disregarded were false and misleading in that they contained misrepresentations and
failed to disclose material facts necessary in order to make the statements made, in light of the
circumstances under which they were made, not misleading.

218.    The Section 10(b) Defendants violated Section 10(b) of the Exchange Act and
Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue
statements of material facts or omitted to state material facts necessary in order to make the
statements made, in light of the circumstances under which they were made, not misleading;
and/or (iii) engaged in acts, practices, and a course of business that operated as a fraud or deceit
upon Plaintiffs and in connection with their purchases or acquisitions of BP ADSs during the
Relevant Period.  As detailed herein, the misrepresentations contained in Defendants' public
statements included statements relating to BP's integration of the recommendations set forth in
the Baker Report, the Company's (and its divisions') statements about their ability to respond to
a "worst case" spill in the Gulf far in excess of the amount of oil leaking from the Macondo well,
and statements relating to the amount of oil leaking into the Gulf from the Macondo well during
the Relevant Period.

219.     The Section 10(b) Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Plaintiffs; made various false and/or misleading statements of material facts; made the above statements with knowledge or a reckless disregard for the truth; and employed devices, schemes, and artifices to defraud in connection with the purchase or sale of BP ADSs, which were intended to, and did deceive Plaintiffs, for the reasons set forth above.

220.     The Section 10(b) Defendants are liable for the materially false and misleading statements attributed to them as set forth above.

221.     As described above, the Section 10(b) Defendants acted with scienter in that they either had actual knowledge of the misrepresentations set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and disclose the true facts, even though such facts were available to them.   Specifically, Section 10(b) Defendants knew or were reckless in not knowing that BP was not, contrary to its public statements, implementing the recommendations set forth in the Baker Report, that the Company's (and its divisions') statements about their ability to respond to a "worst case" spill in the Gulf far in excess of the amount of oil leaking from the Macondo well overstated BP's ability to responds to "worst case" spill, and statements relating to the amount of oil leaking into the Gulf from the Macondo well during the Relevant Period were contradicted by BP's internal documents.

222.     Plaintiffs have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for BP ADSs.  Plaintiffs would not have purchased or otherwise acquired these ADSs at the prices they paid, or at all, if they had been aware that the

market price had been artificially and falsely inflated by the Section 10(b) Defendants'
materially false and misleading statements.

223.    As a direct and proximate result of the Section 10(b) Defendants' wrongful
conduct, Plaintiffs suffered damages in connection with their purchases or acquisitions of BP
ADSs during the Relevant Period.

## SECOND CLAIM
### Violation of Section 20(a) of The Exchange Act Against Hayward, Suttles and McKay (collectively, the "Section 20(a) Defendants") (RELATING TO ADS PURCHASES)

224.    Plaintiffs repeat and reallege each and every allegation contained above as if fully
set forth herein.

225.    The Section 20(a) Defendants acted as controlling persons of BP, BP America
and BP Exploration within the meaning of Section 20(a) of the Exchange Act as alleged herein.
By virtue of their high-level positions, and their ownership and contractual rights, participation
in and/or awareness of BP, BP America and BP Exploration's operations and/or intimate
knowledge of the false and misleading statements disseminated by BP, BP America and BP
Exploration to the investing public, the Section 20(a) Defendants had the power to influence and
control and did influence and control, directly or indirectly, the decision-making of BP, BP
America and BP Exploration, including the content and dissemination of the various statements
which Plaintiffs contend are false and misleading and/or omitted material information.  The
Section 20(a) Defendants were provided with or had unlimited access to copies of the BP, BP
America and BP Exploration's reports, press releases, public filings, oil spill response
capabilities and other statements alleged by Plaintiffs to be misleading prior to and/or shortly
after these statements were issued and had the ability to prevent the issuance of the statements or
cause the statements to be corrected.

226.    In particular, each of the Section 20(a) Defendants had direct and supervisory involvement in the day-to-day operations of BP, BP America and BP Exploration and, therefore are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

227.    As set forth above, the Section 10(b) Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Section 20(a) Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of the Section 20(a) Defendants wrongful conduct, Plaintiffs suffered damages in connection with their purchases of the Company's ADSs during the Relevant Period.

### THIRD CLAIM
### Common Law Fraud and Deceit Against BP, BP Exploration, Hayward,
### Suttles and McKay (collectively, the "Common Law Fraud Defendants")
### (RELATING TO ADS AND ORDINARY SHARE TRANSACTIONS)

228.    Plaintiffs hereby incorporate by reference all paragraphs of this Complaint as if fully set forth herein.

229.    During the Relevant Period, the Common Law Fraud Defendants, individually and in concert with others, participated in the fraudulent scheme set forth herein and made (as attributed to them above), or caused BP, BP America or BP Exploration to make, statements which, at the time and in light of the circumstances they were made, were materially false and misleading representations of fact, or omitted to state material facts which they had a duty to disclose to Plaintiffs and the investing public.

230.    When making the false and misleading representations, the Common Law Fraud Defendants knew they were false or made them with reckless disregard for their truth.

71

231.    Because BP is a public company, the Common Law Fraud Defendants knew and understood that BP's statements would be distributed to Plaintiffs and the investing public, and that investors, such as Plaintiffs, and/or their agents, would rely and had a right to rely on such statements. The Common Law Fraud Defendants were required to present BP's operations in a fair and accurate manner in, among other documents, reports that the Common Law Fraud Defendants were required to file with regulators (including the MMS), SEC filings, press releases and other public statements. Moreover, because BP, BP America and BP Exploration were involved in drilling for oil in the Gulf, the Common Law Fraud Defendants knew and understood that statements regarding BP, BP America or BP Exploration's oil spill response capabilities would be distributed to Plaintiffs and the investing public, and that investors, such as Plaintiffs, and/or their agents, would rely and had a right to rely on such statements. The Common Law Fraud Defendants were required to present BP, BP America or BP Exploration's oil spill response capabilities in a fair and accurate manner in, among other documents, reports that the Common Law Fraud Defendants were required to file with regulators (including the MMS), SEC filings, press releases and other public statements.

232.    The Common Law Fraud Defendants made (as attributed to them above), or caused BP, BP America or BP Exploration to make, the false and misleading representations with the intent that they be acted upon by others, including investors and prospective investors in BP securities.

233.    Plaintiffs, and/or their agents, relying upon the Common Law Fraud Defendants' statements containing the false and misleading information and/or the integrity of the market, purchased BP securities at artificially inflated prices during the Relevant Period.

234.  Plaintiffs, and/or their agents, acted in justifiable reliance on the Common Law Fraud Defendants' false and misleading statements and/or the integrity of the market, without knowing that the Common Law Fraud Defendants' statements were false, when making investment decisions regarding BP securities.  The Common Law Fraud Defendants' false and misleading statements also induced Plaintiffs, and/or their agents, to retain Plaintiffs' holdings in BP securities during the Relevant Period.

235.  As a direct and proximate result of the Common Law Fraud Defendants' misrepresentations and omissions, Plaintiffs suffered damages in connection with their purchases of BP securities during the Relevant Period.

236.  The Common Law Fraud Defendants' misrepresentations and omissions, as set forth herein, constitute fraud and deceit under Texas common law.

### FOURTH CLAIM
**Statutory Fraud – Tex. Bus. & Comm. Code § 27.01 ("Section 27.01") Against All Defendants**
**(RELATING TO ADS AND ORDINARY SHARE TRANSACTIONS)**

237.  Plaintiffs hereby incorporate by reference all paragraphs of this Complaint as if fully set forth herein.

238.  During the Relevant Period, the Defendants, individually and in concert with others, participated in the fraudulent scheme set forth herein and made (as attributed to them above), or caused BP, BP America, BP Exploration to make, statements which, at the time and in light of the circumstances they were made, were materially false and misleading representations of fact, or omitted to state material facts which they had a duty to disclose to Plaintiffs and the investing public.

239.  Section 27.01 does not require proof of knowledge or recklessness to establish liability.  However, as set forth above, when making the false and misleading representations,

BP, BP America, BP Exploration, Hayward, Suttles and McKay knew that statements issued to BP's investors and prospective investors were false or made such statements with reckless disregard for their truth.

240. Because BP is a public company, the Defendants knew and understood that BP's statements would be distributed to Plaintiffs and the investing public, and that investors, such as Plaintiffs, and/or their agents, would rely and had a right to rely on such statements. The Defendants were required to present BP's operations in a fair and accurate manner in, among other documents, reports that Defendants were required to file with regulators (including the MMS), SEC filings, press releases and other public statements. Moreover, because BP, BP America and BP Exploration were involved in drilling for oil in the Gulf, the Defendants knew and understood that statements regarding BP, BP America or BP Exploration's oil spill response capabilities would be distributed to Plaintiffs and the investing public, and that investors, such as Plaintiffs, and/or their agents, would rely and had a right to rely on such statements. Defendants were required to present BP, BP America or BP Exploration's oil spill response capabilities in a fair and accurate manner in, among other documents, reports that Defendants were required to file with regulators (including the MMS), SEC filings, in press releases and other public statements.

241. Defendants made (as attributed to them above), or caused BP, BP America or BP Exploration to make, the false and misleading representations with the intent that they be acted upon by others, including investors and prospective investors in BP securities.

242. Plaintiffs, and/or their agents, relying upon Defendants' statements containing the false and misleading information and/or the integrity of the market, purchased BP securities at artificially inflated prices during the Relevant Period.

74

243.    Plaintiffs, and/or their agents, acted in justifiable reliance on Defendants' false and misleading statements and/or the integrity of the market, without knowing Defendants' statements were false, when making investment decisions regarding BP securities.  Defendants' false and misleading statements also induced Plaintiffs, and/or their agents, to retain Plaintiffs' holdings in BP securities during the Relevant Period.

244.    As a direct and proximate result of Defendants' violations of Section 27.01, Plaintiffs suffered damages in connection with their purchases of BP securities during the Relevant Period.

245.    Defendants' misrepresentations and omissions, as set forth herein, constitute violations of Section 27.01.

## FIFTH CLAIM
### Negligent Misrepresentation Against All Defendants
### (RELATING TO ADS AND ORDINARY SHARE TRANSACTIONS)

246.    Plaintiffs hereby incorporate by reference all paragraphs of this Complaint as if fully set forth herein except those sounding in fraud.  This Count is brought for breaches of duties owed to Plaintiffs by Defendants and is not based on Defendants defrauding Plaintiffs.

247.    During the Relevant Period, Defendants, made (as attributed to them above), or caused BP, BP America or BP Exploration to make, statements which, at the time and in light of the circumstances they were negligently made, were materially false and misleading representations of fact, or omitted to state material facts which they had a duty to disclose to Plaintiffs and the investing public.

248.    Defendants' misrepresentations and omissions were made in the course of Defendants' business, profession, and/or employment for their own financial benefit and for the guidance of BP's investors, such as Plaintiffs, and/or their agents, in investment decisions with respect to BP securities.

249.     Defendants owed Plaintiffs, as prospective investors in BP securities, the duty of presenting BP, BP America and BP Exploration's operations and oil spill response plans in a fair and accurate manner. As BP shareholders, Plaintiffs were in privity with the Company and its officers and directors.

250.     Defendants' misrepresentations and omissions, if not intentional or reckless, were the result of negligence in breach of Defendants' duty to make accurate representations to BP shareholders and prospective investors when issuing false and misleading statements during the Relevant Period. Defendants failed to exercise reasonable care or competence in obtaining or communicating information regarding BP's operations to Plaintiffs, and/or their agents, and the investing public.

251.     Because BP is a public company, the Defendants knew and understood that BP's statements would be distributed to Plaintiffs and the investing public, and that investors, such as Plaintiffs, and/or their agents, would rely and had a right to rely on such statements.   The Defendants were required to present BP's operations in a fair and accurate manner in, among other documents, reports that Defendants were required to file with regulators (including the MMS), SEC filings, press releases and other public statements.   Moreover, because BP, BP America and BP Exploration were involved in drilling for oil in the Gulf, the Defendants knew and understood that statements regarding BP, BP America or BP Exploration's oil spill response capabilities would be distributed to Plaintiffs and the investing public, and that investors, such as Plaintiffs, and/or their agents, would rely and had a right to rely on such statements.   Defendants were required to present BP, BP America or BP Exploration's oil spill response capabilities in a fair and accurate manner in, among other documents, reports that Defendants were required to

file with regulators (including the MMS), SEC filings, in press releases and other public statements.

252.    Each Defendant negligently made (as attributed to them above), or caused BP, BP America or BP Exploration to negligently make, the false and misleading representations set forth herein with the intent that they be acted upon by others, including investors and potential investors in BP securities.

253.    Plaintiffs, and/or their agents, relying upon Defendants' statements containing the false and misleading information and/or the integrity of the market, purchased BP securities at artificially inflated prices during the Relevant Period.

254.    Plaintiffs, and/or their agents, acted in justifiable reliance on Defendants' false and misleading statements and/or the integrity of the market, without knowing Defendants' statements were false, when making investment decisions regarding BP securities. Defendants' false and misleading statements also induced Plaintiffs, and/or their agents, to retain Plaintiffs' holdings in BP securities during the Relevant Period.

255.    As a direct and proximate result of Defendants' misrepresentations and omissions, Plaintiffs suffered damages in connection with their purchases of BP securities during the Relevant Period.

256.    Defendants' misrepresentations and omissions, as set forth herein, constitute negligent misrepresentations.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray for relief and judgment as follows:

a.    Awarding compensatory damages and equitable relief in favor of Plaintiffs against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

77

b.   Awarding exemplary damages in favor of Plaintiffs against all Defendants;

c.   Awarding Plaintiffs their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

d.   Awarding Plaintiffs such other and further relief as this Court may deem just and proper.

Dated: April 20, 2012

Respectfully submitted,

CALLIER & GARZA, L.L.P.

_[signature]_

BERNARDO S. GARZA
SDT Bar No. 4779
State Bar No. 03663500
4900 Woodway, Suite 700
Houston, TX 77056
(713) 439-0248
(713) 439-1908 (fax)

*Liaison Counsel for Plaintiffs*

KESSLER TOPAZ MELTZER
& CHECK, LLP

_[signature]_

DAVID KESSLER
DARREN J. CHECK
NAUMON A. AMJED
(motion for admission pro hac vice to follow)
280 King of Prussia Road
Radnor, PA 19087
(610) 667-7706
(610) 667-7056 (fax)

*Attorneys for Plaintiffs*